COVA *v.* HARLEY DAVIDSON MOTOR COMPANY

1. Products Liability—Economic Loss.

> A consumer can sue a manufacturer directly for economic loss resulting from a defect in a product attributable to the manufacturer without proving negligence.

2. Products Liability—Evidence—Defect.

> The liability of a manufacturer is not a liability without fault; one who sues a manufacturer must prove a defect attributable to the manufacturer and a causal connection between the defect and the injury or damage of which he complains.

3. Products Liability—Statutes—Limiting Scope.

> A manufacturer's liability which arises by implication of law is not limited by the Uniform Commercial Code.

4. Products Liability—Strict Liability.

> "Strict liability" implies absolute liability, as in cases dealing with dangerous animals or abnormally dangerous activities; therefore, "strict liability" is an inappropriate term to be used in cases dealing with manufacturers' liability.

5. Products Liability—Remedy—Nature.

> A consumer's remedy in a product liability case is an amalgam of tort and contract concepts, as well as other concepts; however, the remedy is sufficiently dissimilar to any one of these concepts so that emphasis on either the tort or contract origin is misleading.

6. Products Liability—Definition—Words and Phrases.

> Products liability is the liability which the law imposes on a manufacturer in favor of a consumer for loss suffered by reason of a defective product attributable to the manufacturer.

---

Reference for Points in Headnotes

[1-7] 46 Am Jur, Sales § 819 *et seq.*

7. PRODUCTS LIABILITY—DAMAGES—LOSS OF PROFITS.

> Damages in a products liability case should be separated by the jury into damages for (1) loss of the bargain and repair costs and (2) loss of profits, because whether lost profits are recoverable has not been settled.

Appeal from Oakland, Arthur E. Moore, J. Submitted Division 2 February 4, 1970, at Detroit. Decided September 30, 1970.

Complaint by Charles C. and Julia Cova against Harley Davidson Motor Company for breach of implied warranty of quality. Complaint dismissed. Plaintiffs appeal. Reversed and remanded for trial.

*Lampert & Fried,* for plaintiffs.

*Nelson S. Shaperd,* for defendant.

Before: LEVIN, P. J., and J. H. GILLIS and BRONSON, JJ.

LEVIN, P. J. The plaintiffs, Charles C. and Julia Cova, doing business as Bob-O-Link Golf Course, purchased golf carts manufactured by the defendant, Harley Davidson Motor Company. The complaint alleged that the carts were defective in that they did not operate properly and that this constituted a breach of an implied warranty of quality.

The carts were purchased by the plaintiffs from a dealer, defendant Lawn Equipment Corporation, not directly from the manufacturer. The trial judge dismissed the complaint, apparently on the ground that where the damages claimed are for economic loss, not personal injury, a consumer may not maintain an action against the manufacturer for breach

of warranty unless there is privity of contract. We reinstate the complaint and remand for trial.[1]

The history of the development of the consumer's direct remedy against the manufacturer has been frequently told. We, therefore, begin with our Supreme Court's landmark decision in *Piercefield* v. *Remington Arms, Inc.* (1965), 375 Mich 85, 98, where the Court declared that *Spence* v. *Three Rivers Builders & Masonry Supply, Inc.* (1958), 353 Mich 120, and succeeding decisions had "put an end in Michigan to the defense of no privity, certainly so far as concerns an innocent bystander injured, as this plaintiff pleads, and that a person thus injured should have a right of action against the manufac-

---

[1] The complaint alleges that the plaintiffs purchased 12 golf carts from Lawn Equipment Corporation and that Lawn Equipment represented that they were constructed in a good and workmanlike manner and that they would stand up under all reasonable and proper uses for rental purposes on plaintiffs' golf course and that they were of good, sound construction, manufactured from sound and sturdy materials and were manufactured with good, sound, sturdy parts and contained no hidden defects or imperfections.

It was also alleged that, by reason of the relationship between the plaintiffs, as purchaser, and Lawn Equipment, as seller, and Harley Davidson, as manufacturer, there was "on the part of Harley Davidson as well as Lawn Equipment an implied warranty that said golf carts were well and sturdily constructed in a workmanlike manner, of strong materials and parts, are adapted for the use for which they were manufactured and sold, that is, for rental and commercial purposes on golf courses, and that they would give satisfactory service in every respect, and contain no hidden defects or imperfections."

It is further alleged that when the carts were put in operation in June 1967 "problems developed with the following items on said carts: throttle wires, generators and starters, ignition switches, carburetors, coil brackets, ignition points, spark plugs, and on one cart a rear axle, and that such parts failed to function" and that repeated repairs were made on the parts in 1967 and 1968 but they continued to break down.

The damages claimed are for the cost of repairs and rentals lost while the carts were under repair.

In a second count it it claimed that Lawn Equipment expressly represented and Harley Davidson impliedly represented that service parts for the carts would be available upon demand or within a reasonable length of time and that in breach of such representation the plaintiffs were required to wait for periods of one week or a month for parts, during which time the carts were out of service.

Damages of $10,000 are claimed under Count I and $5,000 under Count II.

turer on the theory of breach of warranty as well as upon the theory of negligence."[2]

While the *Piercefield* plaintiff suffered personal injuries, not economic loss, in *Spence* the loss was entirely economic.   There the plaintiff owned several cottages in a resort area, one of which was built from cinder blocks manufactured and sold for building purposes by the defendant.   A few months after the cottage was built the blocks started to crack, chip, and pit.[3]   The plaintiff claimed that under § 15 of the Uniform Sales Act[4] there was an implied warranty that the blocks were of merchantable quality and the warranty had been breached.   The defendant contended that the difficulties did not impair the safeness or the habitability of the cottage.   The Supreme Court responded (p 126):

"[I]n this day and age appearance as well as structural safety and durability is an important factor in determining the merchantable quality and fitness of these particular products as used in this case."

And later (p 130):

"We can also find no reason in logic or sound law why recovery in these situations should be confined to injuries to persons and not to property and allowed in food and related cases and denied in all others."

The Court ruled (p 128) that it would no longer continue to be "hobbled by such an obsolete rule [privity] and its swarming progeny of exceptions."

[2] Piercefield was injured when the barrel of a shotgun, fired by his brother, exploded.   It was conceded that Piercefield was neither a purchaser nor a user of the defective shell.   These possible distinctions were held to be no longer relevant.

[3] There was testimony that the deterioration of the blocks was progressive and that, at some undesignated future time, this would probably endanger the structure.

[4] CL 1948, § 440.15 (Stat Ann 1964 Rev § 19.255).   The corre-

Having thus spoken forthrightly, the Court blurred its decision by going on to intimate that the consumer's remedy was grounded in negligence, not warranty.[5]   And it will be remembered that in the present case the plaintiff proceeds on an implied warranty, not a negligence, theory.

*Spence* was followed by *Manzoni* v. *Detroit Coca-Cola Bottling Company* (1961), 363 Mich 235.   Theresa Manzoni commenced an action for breach of implied warranty claiming that she was injured as a result of drinking Coca-Cola contaminated by a foreign substance.   The manufacturer contended that in a suit upon an implied warranty there is "no distinction between a count in implied warranty or in tort" and the burden was upon the plaintiff to show negligence.   This reasoning was rejected; the Court

sponding provision under present law is § 2–314 of the Uniform Commercial Code (MCLA § 440.2314 [Stat Ann 1964 Rev § 19.2314]).

[5] The *Spence* Court said (p 130): "[T]here is authority for treating actions of this kind based upon implied warranty by the manufacturer as though they were explicitly grounded upon negligence."   The Court then went on to refer to its previous holding in *Ebers* v. *General Chemical Co.* (1945), 310 Mich 261, 275, where, in allowing recovery by a remote vendee against the manufacturer of a defective insecticide for economic loss of peach trees, the Court had observed (p 275): "Although plaintiff claims under the theory of an implied warranty, the real question is whether or not defendant was negligent."   The *Spence* Court also referred to its previous holding in *Hertzler* v. *Manshum* (1924), 228 Mich 416, 423, a suit against a food manufacturer for breach of implied warranty, where the Court said "Plaintiff's case, in its last analysis, is bottomed on negligence."   After reviewing such earlier declarations, the *Spence* Court concluded that since it had told litigants and their counsel that suing for breach of implied warranty is in effect tantamount to suing for negligence, it (p 131) "lacked the heart to banish this plaintiff in this case because she trustingly took us at our word.   We suggest in the future, however, that, where warranted by the circumstances, such declarations should sound explicitly in negligence as well as for claimed breach of warranty."

The Court went on, however, to observe (p 132) "that the modern trend in other jurisdictions is to permit recovery by remote vendees against the manufacturer whether the action sounds in negligence or on an implied warranty or both."   The Court concluded its opinion with the statement (p 135) that the trial judge should have permitted recovery either on a theory of negligence *or* implied warranty.

again reviewed the history[6] of the development of the consumer's remedy against the manufacturer, summing up as follows (pp 239, 240):

"The result of the operation of these forces has been a marked change in legal theory on a wide front. The food and beverage area is but a small subdivision of a field much more comprehensive, involving the whole topic of products liability. It ranges through areas both of contract and tort, from the liability of the manufacturer of a defective automobile wheel, or cinder blocks [citing *Spence*] to that of the seller of an inflammable dress, or the distributor of unwholesome food or contaminated drink, or even the purveyor of a caustic perfume."

The Court added that because of the growing pressure for consumer protection the requirement of privity had been abandoned, thereby opening the door to the widespread use of the *warranty* theory, and that in Michigan recovery is permitted in this type of case (p 241) "either on a theory of negligence *or* implied warranty," again citing *Spence*. (Emphasis supplied.) The Court concluded that the consumer has a choice of remedies and said (p 241):

"[I]n a suit upon a warranty theory it is not necessary to show negligence, but rather breach of the implied warranty."[7]

---

[6] "The warranty action, of ancient lineage, did not require a showing of negligence (though a showing of negligence, of course, did not defeat it) but it did require privity of contract. The negligence action, on the other hand, did not require privity but it did require that the plaintiff show a lack of due care with respect to the particular article, *e.g.*, the bottle of Coca Cola in the present case. Either of these doctrines, literally applied, gave the manufacturer a virtual immunity. As for privity, the injured consumer and the manufacturer were contractual strangers, unless related by a fiction. As for negligence, the annual output of such bottles often ran into the millions. To show the negligence of the manufacturer with respect to any particular bottle was an impossibility." *Manzoni* v. *Detroit Coca-Cola Bottling Company* (1961), 363 Mich 235, 238.

[7] It is true that the Court qualified this by adding after the words

Similarly, see *Hill* v. *Harbor Steel & Supply Corporation* (1965), 374 Mich 194, 204.[8]

In *Santor* v. *A & M Karagheusian, Inc.* (1965), 44 NJ 52, 60 (207 A2d 305, 309, 16 ALR3d 670), the New Jersey Supreme Court, in a well-reasoned opinion, reviewed its famous *Henningsen*[9] decision, conceded that serious consideration had not been given in that case to whether a distinction should be made between personal injury and loss of bargain claims, and, after considering that question, ruled that a manufacturer of carpeting, defective because of an unusual line in it, was subject to liability to the consumer. The court reasoned that the manufacturer is the "father of the transaction" and said (p 60):

"From the standpoint of principle, we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively-made product has caused personal injury, and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it."

Although the Michigan Supreme Court has not in so many words declared that a consumer may re-

"breach of the implied warranty" the words "that the food is wholesome and fit for human consumption." But in light of the earlier statement that the food and beverage area is but a small subdivision of the much more comprehensive topic of product liability, including cinder blocks, the Court's statement cannot properly be limited to food. See *Hill* v. *Harbor Steel and Supply Corporation* (1965), 374 Mich 194.

[8] Opinions by SOURIS, J., in which three other justices concurred; an additional justice concurred in the result.

[9] *Henningsen* v. *Bloomfield Motors, Inc.* (1960), 32 NJ 358 (161 A2d 69, 75 ALR2d 1), relied on by our Supreme Court in *Piercefield* v. *Remington Arms Co.* (1965), 375 Mich 85, 99; *Manzoni* v. *Detroit Coca-Cola Bottling Company* (1961), 363 Mich 235, 240, and *Browne* v. *Fenestra, Inc.* (1965), 375 Mich 566, 571.

cover from a manufacturer for breach of implied warranty without proving negligence and without regard to privity even in a case where the product is not inherently dangerous and no personal injuries have been suffered, the loss being entirely economic, we are persuaded from our review of the foregoing decisions of our Supreme Court and from the trend of authorities in other jurisdictions that a consumer can sue a manufacturer directly for economic loss resulting from a defect in a product attributable to the manufacturer without proving negligence. If all our Supreme Court said in *Spence* was that a consumer can sue a manufacturer for negligence without proving privity of contract, it said nothing new at all, and *Spence,* widely regarded as one of the more important cases in this sector of the law, is a cipher.

On principle the manufacturer should be required to stand behind his defectively-manufactured product and held to be accountable to the end user even though the product caused neither accident nor personal injury. The remote seller should not be insulated from direct liability where he has merely mulcted the consumer.

This does not mean that the liability of the manufacturer is a liability without fault. As stated in *Piercefield,* one who sues a manufacturer (pp 98, 99) "must prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains."

It has been suggested that the time has come further to define the nature of the liability of the manufacturer, to decide whether it is a "strict liability", and to decide to what extent it arises under and is affected by the warranty provisions in the sale of goods section of the Uniform Commercial

Code.[10]   In the judicial development of the consumer's direct remedy against the manufacturer, several dozen legal theories were coalesced in justification and rationalization of the results which the courts reached.[11]   Some of these concepts have been enacted into statutes, such as the Uniform Sales Act,[12] and later the Uniform Commercial Code. But, as the UCC draftsmen acknowledged,[13] the remedy is not statutory, but essentially one fashioned by the courts.[14]

The American Law Institute's partial restatement of the consumer's tort remedy[15] and the recodification of his warranty remedy in the Uniform Commercial Code record salient features of the common law as it had evolved through the dates that the restate-

---

[10] MCLA § 440.2313 *et seq.* (Stat Ann 1964 Rev § 19.2313 *et seq.*).

[11] See *Santor* v. *A & M Karagheusian, Inc.* (1965), 44 NJ 52, 66, 67 (207 A2d 305, 311, 16 ALR3d 670); *Seely* v. *White Motor Company* (1965), 63 Cal 2d 9, 14 (45 Cal Rptr 17, 22, 403 P2d 145, 149).

[12] CL 1948, § 440.15 *et seq.*

[13] In the official commentary to the uniform commercial code it is said that the code remains neutral as to its effect on consumer remedies and, consequently, it neither enlarges nor restricts "the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain." See Official UCC comment to § 2–318, reprinted 21 MCLA § 440.2318, p 364.

[14] See, *Browne* v. *Fenestra, Inc., supra* fn 9, pp 571, 572, adopting the views of the Supreme Court of New Jersey in *Henningsen* (see fn 9) that the defenses of disclaimer of liability and of elimination of implied warranties by an express warranty are not available in a consumer's action for breach of implied warranty of fitness; the Court spoke of the implied warranty of fitness as (p 571) "implied by law." Similarly, see *Piercefield* v. *Remington Arms Co., supra,* fn 9, p 100, holding that compliance with the notice requirement of § 49 of the Uniform Sales Act (UCC § 2–607(3)(a), MCLA § 440.2607(3)(a) [Stat Ann 1964 Rev § 19.2607(3)(a)]) is not a prerequisite to suit because the warranty "arises by legal implication distinct from a contract of sale." It is, therefore, clear that the scope of the consumer's remedy is not circumscribed by the language of the Uniform Commercial Code.

See, also, *Santor* v. *A & M Karagheusian, Inc., supra* fn 11, pp 66, 67; *Greenman* v. *Yuba Power Products, Inc.* (1962), 59 Cal 2d 57, 62, 64 (27 Cal Rptr 697, 700, 701, 377 P2d 897, 900, 901, 13 ALR3d 1049).

[15] See Restatement Torts 2d, § 402A and accompanying commentary.

ment and code drafters did their work. These formulations, however, no more mark the boundaries of the consumer's remedy than did the earlier effort at codification, the Uniform Sales Act (see footnote 14).

The suggestion that we now label the manufacturer's liability a "strict liability" does not strike us as particularly sound or useful. In *Greenman* v. *Yuba Power Products, Inc.* (1963), 59 Cal 2d 57 (27 Cal Rptr 697, 377 P2d 897, 13 ALR3d 1049), the California Supreme Court announced that the manufacturer's liability was a "strict liability in tort." This term, apparently borrowed from the writings of Professors Harper and James and Dean Prosser,[16] was not defined in the *Greenman* opinion. It appears to have been used in their writings, in that opinion and in other judicial opinions which adopted this term[17] to convey the following concepts:

1. The manufacturer's liability does not depend on proof of negligence; it is the same kind of liability as arises from a breach of warranty, express or implied, or a false representation, express or implied.

2. Although traceable conceptually to warranty as well as tort, this liability, imposed by law, is a tort liability, not dependent on the existence of a contract or contract principles and, thus, it arises independently of the Uniform Sales Act and the Uniform Commercial Code.[18]

---

[16] See 2 Harper and James, Law of Torts, § 28.15 (1956) p 1569; Prosser, Strict Liability to the Consumer, 69 Yale LJ 1099 (1960). See, also, a group of articles in 24 Tenn L Rev 923 *et seq.* (1957).

[17] See Anno: Products Liability: Strict Liability in Tort, 13 ALR 3d 1057; Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn L Rev 791 (1966); Prosser, Strict Liability to the Consumer in California, 18 Hastings LJ 9 (1966).

[18] It was primarily to avoid the basic warranty origin of the consumer remedy and the appurtenant historical baggage that the "new" remedy was termed a liability "in tort". See Duesenberg and King, Sales and Bulk Transfers Under UCC, § 7.06[1], pp 7–73, 7–74, for

3. While it is not necessary to prove negligence, the manufacturer is not absolutely liable. He is liable only if the product is defective. And, even if it is defective, in some cases he still may not be liable, *e.g.*, experimental drugs and other unavoidably unsafe products, the marketing of which does not imply they are free of defect.[19]

If that is what the term "strict liability" means then it would appear that under Michigan law, as laid down by our Supreme Court, the manufacturer's liability is a strict liability or something akin to it. As held in *Piercefield*, the manufacturer's liability arises by implication of law and is not limited by the Uniform Commercial Code, and negligence need not be proved, only a defect attributable to the manufacturer causally related to the plaintiff's damage.[20]

While the Michigan development has paralleled, even preceded,[21] the development in other jurisdictions, we see no need to join the parade of states which have adopted the new terminology of "strict liability".[22]  To the new generation of lawyers, trained in the new jargon, the meaning of the term "strict liability" may be clear: "a rose by any other name", etc.  But for many of the rest of us the

a list of the complications resulting from the warranty or contract origin which over the years were eliminated by judicial decision.

[19] See Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn L Rev 791, 805 *et seq.*

[20] Dean Prosser counts Michigan as a strict liability state, citing *Hill* v. *Harbor Steel and Supply Corporation, supra* fn 7; *Browne* v. *Fenestra, Inc., supra* fn 9; *Piercefield* v. *Remington Arms Co., supra* fn 9; *Spence* v. *Three Rivers Builders & Masonry Supply, Inc.* (1958), 353 Mich 120; *Manzoni* v. *Detroit Coca-Cola Bottling Company, supra* fn 9; Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn L Rev 791, 795 (1966). Similarly, see Wyllie, Products Liability in Michigan: Implied Warranty, Strict Tort, or Both?, 15 Wayne L Rev 1558, 1564 (1969); Anno: Products Liability: Strict Liability in Tort, 13 ALR3d 1057, 1072.

[21] See Prosser, The Law of Torts (3d ed), § 97, p 677, referring to *Spence* as "the real bursting of the dam."

[22] See cases collected in the annotation cited in fn 17.

concept of a strict liability carries overtones of its former rubric, "absolute" liability.[23]

The manufacturer's liability, although arising even if he has exercised due care, is not the same liability absolutely or strictly imposed on persons who keep dangerous animals or who engage in abnormally dangerous activity.[24]

If we adopt the "strict liability" terminology, lawyers who find it to their clients' advantage can be expected to urge upon us the analogies of the absolute (strict) nonproduct liability cases as being necessarily more pertinent than alternative sources of precedent and reasoning. There is a significant risk that the relabeling of the manufacturer's liability as a "strict liability" may result in the casual adoption of the absolute (strict) liability precedents developed in cases dealing with dangerous animals and abnormally dangerous activities without careful analysis of whether they are truly apposite. Nothing but further confusion is achieved by using the same label to describe both the liability of a manufacturer to a consumer and of a person who harbors

[23] Indeed, Justice Traynor, the author of the *Greenman* opinion, in an earlier concurring opinion used the terms "strict liability" and "absolute liability" interchangeably. See *Escola* v. *Coca-Cola Bottling Co. of Fresno* (1944), 24 Cal 2d 453, 461 (150 P2d 436). Also, see Restatement Torts 2d, § 402A, comment m, authored by Dean Prosser, the reporter, where the following appears:

"The liability stated in this section does not rest upon negligence. It is strict liability, similar in its nature to that covered by chapters 20 and 21. The basis of liability is purely one of tort." Chapters 20 and 21 of the Restatement of Torts appear in division 3, headed "absolute liability." See, also, Prosser, Law of Torts (3d ed), § 77, p 523.

[24] The liability in such cases generally arises without regard to whether there is a "defect" and also without regard to whether the *plaintiff* has any expectation in respect to the defendant's activity which is not fulfilled. The inquiry is whether the *defendant* is aware of the activity, and, if he is, whether what occurred is within the scope of the risk he is thereby deemed to have assumed. See Prosser, Law of Torts (3d ed), p 532 *et seq.*; 2 Harper and James, Law of Torts, § 14.7, p 816, § 14.12, p 838.

dangerous animals or engages in abnormally dangerous activity.

Moreover, it is apparent from *Seely* v. *White Motor Company* (1965), 63 Cal 2d 9 (45 Cal Rptr 17, 403 P2d 145), that it was either oversimplification, exaggeration, or simply misleading to say, as had the same Court in *Greenman,* that the manufacturer's liability to the consumer is a strict liability.[25]

The fact is that no term is likely to be devised that will accurately communicate all the relevant concepts. This entire field of law, which developed through adaptation and analogy to the law of torts and contracts,[26] has been plagued by the labels of these analogies and their appurtenant historical impeditions. Indeed, it might be helpful if we abandoned the continued use in this context of our present and misleading terminology of warranty and representation, express and implied, and strict liability in tort, and simply refer to the manufacturer's liability by the neutral term "product liability."[27] We would thereby acknowledge that the

---

[25] In *Seely* the Court announced that the manufacturer's liability for economic loss is not a strict liability but depends on the law of warranty except to the extent there has been a physical loss of property in which case the manufacturer is strictly liable.

In *Gherna* v. *Ford Motor Co.* (1966), 246 Cal App 2d 639 (55 Cal Rptr 94), where there was a phyical loss of property, an automobile caught fire, a California appellate court ruled that the defendant was subject to liability for the economic loss on a strict liability theory; the Court also ruled that the defendant could be held liable for breach of an implied warranty under a statute, for negligence, and for express warranty arising because of a national advertising campaign.

[26] See fn 6 and the cases cited in fn 32.

[27] It is recognized that the pertinent sections of the Uniform Commercial Code are structured on an interplay of provisions concerning warranties, limitation on recoverable damages, disclaimers, and other defenses and that the substitution of new terminology, *e.g.*, "product liability", might effect an end-run around the compromises apparent in the code formulations. However, comparable results are achieved whenever a court allows an action to be maintained on a tort theory (*e.g.*, misrepresentation, negligence, strict liability) or holds a disclaimer to be unconscionable. The question whether a disclaimer or other defense may be interposed should be decided on its merits in

consumer's remedy is an amalgam of all those concepts and of others as well; but also that it is something sufficiently dissimilar to any of these concepts so that emphasis on either the tort or contract origin is misleading and confusing.[28]

The "product liability" of the manufacturer, and the corresponding right of the consumer, is simply the liability which in this developing jurisprudence the law imposes on a manufacturer in favor of a consumer[29] for loss suffered by reason of a defective product attributable to that manufacturer.[30]   Elim-

---

the factual context of particular cases as they arise; as indicated in *Seely* there are cases involving commercial transactions between persons engaged in business where contractual limitations on liability should be recognized.

See Shanker, Strict Tort Theory of Products Liability and the Uniform Commercial Code, 17 West Res L Rev 5, 7 (1965), Rapson, Products Liability Under Parallel Doctrines: Contrasts between the Uniform Commercial Code and Strict Liability in Tort, 19 Rutgers L Rev 692 (1965); Dusenberg & King, Sale and Bulk Transfers Under the UCC, § 7.03[1], p 7–43.

[28] We don't mean to suggest that in the development and application of the law of product liability we will be able to avoid analogizing to contract or tort principles; only that it is misleading to pigeonhole the remedy as "strict liability in tort." Of course, as Maitland observed in a somewhat similar context: "The forms of action we have buried, but they still rule us from their graves." Maitland, The Forms of Action at Common Law, p 1.

[29] The word "consumer" has been used in the interest of simplification, not with the intent of defining or limiting the class of persons who may avail themselves of the remedy.

[30] Thus, the following statement, while essentially correct, does not tell the whole story:

"Such liability for defective products is 'strict' in the sense that it is unnecessary to prove the defendant's negligence, and since the liability is 'in tort', the defendant cannot avail himself of the usual contract or warranty defenses which might be available in an action for breach of warranty." 1 Hursh, American Law of Products Liability (1970 Cum Supp), § 5A:2, p 216.

But the basis of liability of the manufacturer can easily be viewed as contractual: The manufacturer's liability is posited on his failure to live up to the consumer's reasonable expectations regarding the product; the liability is for failure to deliver goods of the expected quality. And we apply doctrine as much contract as tort when, although the goods are defective, we hold that the manufacturer is not liable either because the marketing of these goods does not imply they will be free of defect or because of abnormal use or misuse by the consumer or because the manufacturer's disclaimer or exculpatory clause is sustained as valid because of the nature of the proposed

ination of the old terminology would permit this field of law to develop sensibly without continuing allegiance to warranty or tort concepts, whether the question presented is one of pleading, procedure, products and defects covered, disclaimers, abnormal use or misuse by the consumer, other defenses, kinds and measure of damages or some other substantive issue.[31]

The need to eliminate the old terminology becomes apparent upon examination of the cases, not only in Michigan, but in other jurisdictions as well. Recovery has been allowed on a number of different theories against manufacturers for economic loss caused by defective products.[32] Many of these cases

use or the economic strength, knowledgeability and freedom of choice of the buyer.

[31] That the remedy is in fact being so fashioned disentangled from these concepts, see *Browne* v. *Fenestra, supra* fn 9, and *Piercefield* v. *Remington Arms Co., supra* fn 9.

See Mueller, Contracts of Frustration, 78 Yale LJ 576 (1969), Kessler, Products Liability, 76 Yale LJ 887 (1967).

[32] See, generally, Anno: Privity of contract as essential in action against remote manufacturer or distributor for defects in goods not causing injury to person or other property, 16 ALR3d 683; Note, Economic Loss in Products Liability Jurisprudence, 66 Colum L Rev 917 (1966). See, also, Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale LJ 1099, 1143 (1960).

We have found relatively few cases where recovery for economic loss was allowed on a theory of strict liability labeled as such. See *Santor* v. *A & M Karagheusian, Inc., supra* fn 11; *O. M. Franklin Serum Company* v. *C. A. Hoover & Son* (Tex, 1967), 418 SW2d 482 (defective animal serum); *Chapman Chemical Co.* v. *Taylor* (1949), 215 Ark 630 (222 SW2d 820) (crop damage caused by chemical spray). See, also, *Randy Knitwear, Inc.* v. *American Cyanamid Company* (1962), 11 NY2d 5 (226 NYS2d 363, 181 NE2d 399).

"Although the liability of the manufacturer is termed a "strict liability" by the New Jersey Supreme Court in *Santor*, it is apparent that the Court did not mean that the manufacturer is liable in all events; it said (p 313): "It is not necessary in the context of this case to attempt to define the outer limits of the term 'defect'." This parallels what our Supreme Court said in *Piercefield, supra* fn 9, p 99.

In the following cases the basis of the manufacturer's liability for economic loss was implied warranty: *Continental Copper and Steel Industries, Inc.* v. *E. C. "Red" Cornelius, Inc.* (Fla App, 1958), 104 So 2d 40; *Smith* v. *Platt Motors, Inc.* (Fla App, 1962), 137 So 2d 239; *State Farm Mutual Auto Insurance Company* v. *Anderson-Weber, Inc.* (1961), 252 Iowa 1289 (110 NW2d 449);

could be limited and distinguished if we look too closely at the legal theories advanced by the courts

*Ford Motor Company* v. *Grimes* (Tex Civ App, 1966), 408 SW2d 313; *Serijanian* v. *Associated Material and Supply Co.* (1967), 7 Mich App 275 (action against wholesaler); *Hoskins* v. *Jackson Grain Co.* (Fla, 1953), 63 So 2d 514 (action against wholesaler; negligence arising from violation of a statute prohibiting mislabeling was also mentioned as an additional basis of liability) and *Lang* v. *General Motors Corporation* (ND, 1965), 136 NW2d 805 (negligence was an additional basis of liability); *Rhodes Pharmacal Company, Inc.* v. *Continental Can Company, Inc.* (1966), 72 Ill App 2d 362 (219 NE2d 726) (strict liability expressly rejected); *Midwest Game Company* v. *M. F. A. Milling Company* (Mo, 1959), 320 SW2d 547 (negligence for failure to warn plaintiff that fish food sold was not a "complete food", and for breach of implied warranty of fitness).

In a number of cases, in addition to *Gherna, supra* fn 25, courts have relied on the defendant manufacturer's brochures and mass advertising in imposing liability even though there was no privity of contract, in some cases on contract, in others on tort theories. See *Ford Motor Company* v. *Lemieux Lumber Company, Inc.* (Tex Civ App, 1967), 418 SW2d 909 (express warranty because of mass advertising); *Thomas* v. *Olin-Mathieson Chemical Corporation* (1967), 255 Cal App 2d 806 (63 Cal Rptr 454) (express warranty because of national advertising; implied warranty and negligence rejected); *Ford Motor Company* v. *Lonon* (Tenn, 1956), 398 SW2d 240 (misrepresentation of material fact arising from statements in brochure; implied warranty and strict liability rejected); *Randy Knitwear, Inc.* v. *American Cyanamid Company, supra* fn 32 (express warranty arising from national advertising and mislabeling; the court also said that the liability was a strict liability); *Klein* v. *Asgrow Seed Company* (1966), 246 Cal App 2d 87 (54 Cal Rptr 609) (express warranty arising from mislabeling); *Inglis* v. *American Motors Corp.* (1965), 3 Ohio St 2d 132 (32 Ohio Ops 2d 136, 209 NE2d 583) (express warranty because of national advertising); *Conestoga Cigar Co.* v. *Finke* (1891), 144 Pa 159 (22 A 868, 13 LRA 438) (warranty arising from mislabeling); *Free* v. *Sluss* (1948), 87 Cal App 2d Supp 933 (197 P2d 854) (guarantee on soap package); *Studebaker Corporation* v. *Nail* (1950), 82 Ga App 779 (62 SE2d 198) (express warranty); *Spartanburg Hotel Corporation* v. *Alexander Smith, Inc.* (1957), 231 SC 1 (97 SE2d 199) (oral express warranty); *United States Pipe & Foundry Co.* v. *City of Waco* (1937), 130 Tex 126 (108 SW2d 432), *cert. den.* 302 US 749 (58 S Ct 266, 82 L Ed 579) (express warranties); *McAfee* v. *Cargill, Inc.* (SD Cal, 1954), 121 F Supp 5 (warranty).

In *Greenman* v. *Yuba Power Products, Inc., supra* fn 14, the California Supreme Court cut through all this in language worth repeating (p 64):

"Implicit in the machine's presence on the market, however, was a representation that it would safely do the jobs for which it was built. Under these circumstances, it should not be controlling whether plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or

instead of at the facts and the results which were reached. When we look at the facts and the results we find that courts throughout the land have allowed recovery for economic loss, as did our Supreme Court in *Spence,* in cases similar to the present case.

In some of these cases the defect caused an accident resulting in the economic loss.[33] Manufacturers have also been held subject to liability in cases where there was no accident and the product was simply in disrepair, deteriorated, or aesthetically defective.[34]

---

because he merely assumed that it would safely do the jobs it was built to do."

The view that the basis of liability is the "mere presence of the product on the market" was also voiced by the New Jersey Supreme Court in *Santor* v. *A & M Karagheusian, Inc., supra,* fn 11, p 312.

While we recognize the soundness of the reasoning of the *Greenman* and *Santor* courts, we repeat that the attempt in those cases to capsulize recent developments in the sweeping phrase "strict liability in tort" has not aided objective analysis.

[33] Automobiles burned up spontaneously; *Gherna* v. *Ford Motor Co., supra* fn 25; *State Farm Mutual Auto Insurance Company* v. *Anderson-Weber, Inc., supra* fn 32; *Ford Motor Company* v. *Grimes, supra* fn 32. Additionally, *United States Pipe & Foundry Co.* v. *City of Waco, supra* fn 32 (water pipe developed numerous breaks); *Seely* v. *White Motor Co., supra* fn 11.

[34] In addition to the Michigan cases of *Spence* and *Serijanian,* another case where bricks in a house deteriorated, see *Santor* v. *A & M Karagheusian, Inc., supra* fn 11 (carpeting with an unusual line); *Continental Copper and Steel Industries* v. *E. C. "Red" Cornelius, supra* fn 32 (power failure necessitating removal of cable); *Smith* v. *Platt Motors, Inc., supra* fn 32 (automobile did not run properly); *Rhodes Pharmacal Co.* v. *Continental Can Company, supra* fn 32 (aerosol can leaked); *Lang* v. *General Motors Corp., supra* fn 32 (truck tractor did not operate properly); *Inglis* v. *American Motors Corp., supra* fn 32 (automobile did not work properly); *Conestoga Cigar Co.* v. *Finke, supra* fn 32 (defective tobacco); *Free* v. *Sluss, supra* fn 32 (soap didn't work); *Studebaker Corp.* v. *Nail, supra* fn 32 (automobile leaked); *Spartanburg Hotel Corporation* v. *Alexander Smith, Inc., supra* fn 32 (color in rug failed); *Ford Motor Co.* v. *Lemieux Lumber Co., supra* fn 32 (truck was unsuitable for use in rough terrain); *Thomas* v. *Olin-Mathieson Chemical Corp., supra* fn 32 (big game rifle did not work; discovered after the hunter was on safari); *Ford Motor Company* v. *Lonon, supra* fn 32 (tractor did not function properly); *Randy Knitwear, Inc.,* v. *American Cyanamid Company, supra* fn 32 (nonshrink fabrics shrank); *Klein* v. *Asgrow Seed Company, supra* fn 32 (defective seeds); *State ex rel. Western Seed Production Corporation* v. *Campbell* (1968), 250 Or 262 (442 P2d 215) (defective seeds); *Midwest*

The monetary damages most frequently allowed are for loss of the bargain, *e.g.*, the cost of the defective goods, or the difference between the value the goods would have had if they had been free of defect and their value in their defective condition, or the difference between the price paid and the value received.[35]

While there appears to be substantial agreement that a consumer may recover for economic loss, there is considerable controversy as to whether recovery should be allowed for loss of profits and consequential damages.[36]

*Game Company* v. *M. F. A. Milling Company, supra* fn 32 (fish food was not complete, requiring supplementation to maintain normal health of fish); *McAfee* v. *Cargill, Inc., supra* fn 32 (contaminated dog food).

[35] *Santor* v. *A & M Karagheusian, Inc., supra* fn 11; *Smith* v. *Platt Motors, Inc., supra* fn 32; *State Farm Mutual Auto Insurance Co.* v. *Anderson-Weber, Inc., supra* fn 32; *Conestoga Cigar Co.* v. *Finke, supra* fn 32; *Studebaker Corp.* v. *Nail, supra* fn 32; *Spartanburg Hotel Corporation* v. *Alexander Smith, Inc., supra* fn 32; *Ford Motor Company* v. *Lonon, supra* fn 32.

[36] In *Seely* v. *White Motor Company, supra* fn 11, the California Supreme Court affirmed a judgment in favor of the purchaser of a defective automobile of $11,659.44, representing payments on the purchase price, and of $9,240.40 for lost profits resulting from the plaintiff's inability to make normal use of the truck in his business. The Court predicated plaintiff's right of recovery on defendant's breach of an express warranty that the vehicle was free of defects in material and workmanship (but discarded an express limitation on the amount of recovery). The Court said it would allow recovery of the purchase price (loss of the bargain) and for physical damage to the truck caused by a defect attributable to the manufacturer on a strict liability theory, but in dictum said that a manufacturer is not subject to liability for consequential damages (loss of profits) absent an express warranty.

See, also, *Price* v. *Gatlin and Columbia Tractor & Equipment Co.* (1965), 241 Or 315 (405 P2d 502) and *State ex rel. Western Seed Production Corporation* v. *Campbell* (1968), 250 Or 262 (442 P2d 215), where a closely-divided Oregon Supreme Court held a remote seller who is free of fault is not liable for loss of profits.

The *Seely* case is commented on in Wyllie, Products Liability in Michigan: Implied Warranty, Strict Tort, or Both?, 15 Wayne L Rev 1558, 1577 (1969). See, also, Prosser, Strict Liability to the Consumer in California, 18 Hastings LJ 9, 34–36 (1966); Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases, 18 Stanford L Rev 974, 977 (1966); Duesenberg & King, Sales and Bulk Transfers Under UCC, § 7.06[1], pp 7–77, 7–78.

The plaintiff in this case seeks to recover not only the loss of his bargain and the cost of making repairs but also lost profits. The issue whether lost profits should be compensable has not been briefed, no doubt because this case was disposed of at the trial level without reaching the question of damages. The question is now presented abstractly before the case has been tried. We think it would be better to defer addressing ourselves to this question until after a trial in which such damages are in fact awarded.

The plaintiff should be given an opportunity to prove loss of profits. In view of the uncertainty of the law, the jury should be instructed to separate any verdict between damages for (i) loss of the bargain and repair costs and (ii) loss of profits. If damages for loss of profits are awarded it will be soon enough to consider whether there should be limitations on the kinds of plaintiffs who will be permitted to recover consequential damages, the quantum of proofs required, and the other limitations, if any, on this aspect of the manufacturer's product liability.

Reversed and remanded for trial.

All concurred.

---

But, as appears in *Allen* v. *Michigan Bell Telephone Company* (1969), 18 Mich App 632, 640, commercial users do not always have a choice, and exculpatory clauses and disclaimers may not be enforceable against them as well as other consumers.

In the following cases the courts declared that recovery for consequential damages was proper, but in each of these cases the plaintiff showed that there had been a breach of an "express warranty." *Hoskins* v. *Jackson Grain Co., supra* fn 32; *Thomas* v. *Olin-Mathieson Chemical Corporation, supra* fn 32; *Ford Motor Company* v. *Lonon, supra* fn 32; *Klein* v. *Asgrow Seed Company, supra*, fn 32; *Ford Motor Company* v. *Lemieux Lumber Company, supra* fn 32; *Randy Knitwear, Inc.* v. *American Cyanamid Company, supra* fn 32. However, in several of the cases the express warranty was made in general advertising. It is to be doubted whether it will be possible reasonably to distinguish between such warranties and the implication of merchantability inherent in the product's "presence on the market." *Greenman* v. *Yuba Power Products, Inc.*, quoted matter at end of fn 32.