# Staunton

SWIFT AND COMPANY v. JEAN C. WELLS.

September 3, 1959.

Record No. 4966.

Present, All the Justices.

The opinion states the case.

*Archibald G. Robertson* and *Lewis Thomas Booker* (*Hunton, Williams, Gay, Moore & Powell,* on brief), for the plaintiff in error.

*Emanuel Emroch* and *Charles P. Rosner*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This case presents to us the question of the liability of a manufacturer of food products to the consumer thereof for damages for personal injuries sustained by him as the result of the unwholesomeness of such food.

Frank H. Wells, as the agent of his wife, the plaintiff, Jean C. Wells, on Saturday, September 22, 1956, pursuant to her instructions, purchased from Roberson's Super Market a smoked pork shoulder. The shoulder was wrapped in cellophane and labeled by Swift and Company, its processor, as "Swift's Premium Picnic Shoulder."

After purchase of the shoulder, Wells returned to his home, two or three blocks from Roberson's Super Market, and Mrs. Wells immediately placed the shoulder in a new General Electric refrigerator under a temperature of 35 degrees Fahrenheit. It remained in the refrigerator with the cellophane wrapper intact until it was taken out the next day after the plaintiff returned from church. Mrs. Wells said she then cooked it in a pressure cooker until it was completely done. She ate some of it at lunch, but no other member of her family did. After lunch, she put the shoulder back in the refrigerator. Later in the afternoon of that day, Sunday, she suffered cramps in her stomach and felt nauseated. No other member of her family suffered any illness that day.

On Monday morning, September 24, Mrs. Wells cut two or three slices of the shoulder and used them in preparing a sandwich for her husband's lunch, while he was away from home engaged in work. She then put the shoulder back in the refrigerator. Mr. Wells ate the sandwich she made, and about 3:00 o'clock p. m. that afternoon, became sick, began to vomit, and went home. While his wife was atending him she ate four biscuits with slices from the same shoulder. Her older son also ate a piece of the meat from her plate. About two hours afterwards, she became very sick with severe vomiting spells, diarrhea, chills and pains in her head, cramps in her stomach, and began throwing up and passing blood. Her son also became ill. A physician was called and visited her that evening, and diagnosed her illness as gastroenteritis or food poisoning. The next day she was sent to the Medical College of Virginia Hospital, where she remained six days.

On Wednesday, September 26, Frank Wells wrapped up what remained of the shoulder, and put it in the freezing compartment of the Wells' refrigerator. On September 29, 1956, he took the shoulder to Roberson's Super Market and reported the illness in his family to

L. T. Roberson, the owner of that market. Roberson cut the shoulder in half and said that it looked and smelled all right to him. He put it in his freezer, where the temperature was kept below zero.

Two or three days later later, Roberson sent the shoulder to the Virginia State Department of Health for analysis. The Department of Health, upon analyzing and testing the shoulder, found it contained hemolytic staphylococcus aureus germs. We are told that organisms of this type produce a toxin known as enterotoxin, an excretion resulting from the multiplication of staphylococci organisms, which is poisonous to the intestinal tract. The staphylococcus organism is a common one to the skin, mucous membranes, and nasal facings of man, and is found on the skin of some animals. It does not multiply under refrigeration, and is killed by cooking at high temperatures. Under room temperature, it will multiply and give off the poisonous enterotoxin, and if the meat product is later cooked, the staphylococci organisms will be killed; but the enterotoxin previously formed will remain unaffected and poison a human who eats the cooked meat.

It was further stated that staphylococci germs cannot go through a cellophane wrapper, and that meat may taste, smell, and look wholesome, and yet contain the enterotoxin. Their usual source comes from contact with some one who has germs on his skin. About 20% will produce the enterotoxin, and previously formed in meat it may remain therein after the staphylococci organisms have been killed because enterotoxin is relatively more stable.

Expert witnesses disagreed as to whether the enterotoxin was present in the shoulder prior to its cooking. Dr. Miles E. Hench, a medical bacteriologist, and Director of the Bacteriological Laboratory of the Medical College of Virginia, after being told the facts relative to the illness of Mrs. Wells and her family, testified that, in his opinion, the enterotoxin was produced and in the picnic shoulder while it was in the custody of the defendant, Swift and Company, before it was delivered to Roberson's Supermarket.

Another medical witness testified on behalf of the defendant that, in his opinion, there was no enterotoxin present when the shoulder was eaten because a microscopic analysis of the shoulder did not reveal living or dead staphylococci, which would necessarily have to be present in large quantities to form the enterotoxin.

Swift and Company, the defendant, is a national meat-packing house. It advertises its various products on a large scale, through the

media of television, radio, magazines, newspapers, and by direct mail. Its smoked picnic shoulders had not been the subject of special advertising for several years prior to September, 1956; but an official of the Company frankly conceded that in advertising its several products, Swift hoped that the consuming public "will buy a lot of other Swift products too."

Mrs. Wells testified that she had seen the advertising of Swift's products on numerous occasions, had bought them, and liked them; and that she relied upon the representations in its advertisements for wholesomeness of its products.

Swift and Company traced the history of the shoulder in controversy from the time it had come from its plant in Missouri to its delivery to Roberson's Super Market. It presented evidence showing that it had fully observed all State and Federal laws relating to the manufacture and sale of food products.

Mrs. Wells instituted this action by motion for judgment alleging the liability of Swift and Company on three counts. The first was on an implied warranty that the shoulder was wholesome and fit for human consumption. The second alleged negligence in processing the shoulder; and the third charged the violation of the Virginia Food and Drink Act, Chapter 16, sections 3-303 and 3-308, Code of Virginia, 1950.

Swift and Company demurred to the motion for judgment upon the ground that there was no privity of contract between the parties, and that there was a misjoinder of causes of action, one count being for breach of warranty of contract and the other two being for tort. The court overruled the demurrer. After testimony in chief for Mrs. Wells had been introduced, the trial court sustained the motion of defendant to strike the evidence as to counts two and three, but overruled as to count one, the implied warranty count.

The jury accepted the evidence on behalf of the plaintiff that the enterotoxin was created in the shoulder while it was in the custody of Swift, and before it was delivered to the Super Market, and also that the plaintiff had thoroughly and properly cooked the shoulder before partaking of it. A verdict for the plaintiff was returned in the sum of $4,000, and judgment was entered accordingly.

On appeal, appellant asserts in its brief that there are but two questions for decision: First, whether the trial court erroneously ruled that privity of contract was not a prerequisite to recovery upon an implied warranty; and, second, whether the court erred in holding that Mrs.

Wells had no cause of action against defendant under count three for the violation of the Virginia Food Act.

Mrs. Wells concedes that no negligence was proven, and while she assigns cross-error to the action of the court in striking the evidence with regard to the third count, she does not urge consideration of the cross-error in the event we sustain the action of the trial court as to count one.

Since an early date, the courts have made a distinction with respect to warranties between the sale of food and other articles of commerce. As far back as 1266 A. D., a statute of England provided: "It is ordained that no one shall sell corrupt victuals." 51 Hen. III, stat. 6. Early English decisions repeatedly held that an action on the case lies against the seller of corrupt food whether the same was warranted to be good or not. Keilway's 92, 72 Eng. Reprint 254; *Roswel* v. *Vaughan*, (1607) Cro. Jac. 196, 79 English Reprint 171.

The foregoing principle was adopted by early decisions in America. In *Van Bracklin* v. *Fonda*, (1815) 12 Johns. N. Y. 468, 7 Am. Dec. 339, the court held that in contracts for sale of provisions for human use it is always implied that they are wholesome and that if they are not the seller is liable in damages to the consumer. The holding was based on the ground that the vendor is bound to know that they are sound and wholesome, a principle said to be "not only salutary, but necessary to the preservation of health and life." (Cases cited 142 A. L. R., page 1485).

In Virginia, we have followed the common law doctrine that one who sells foodstuff for human consumption impliedly warrants its fitness and wholesomeness for such purpose, and is liable not only for the result of any negligent act involved in failing to use due and reasonable care in the preparation and handling of his product; but is also liable on the implied warranty where there is privity of contract between the vendor and vendee. *Norfolk Coca-Cola Bottling Works, Inc.* v. *Krausse*, 162 Va. 107, 173 S. E. 497; *Colonna* v. *Rosedale Dairy Company*, 166 Va. 314, 186 S. E. 94; *Kroger Grocery & Baking Company* v. *Dunn*, 181 Va. 390, 25 S. E. 2d 254; *Blythe* v. *Camp Manufacturing Company*, 183 Va. 432, 32 S. E. 2d 659; 22 Am. Jur., Food, § 103, page 889; 36 C. J. S., Food, § 57, page 1101.

In *Norfolk Coca-Cola Bottling Works, Inc.* v. *Krausse, supra,* plaintiff sued the bottling company for personal injuries suffered as a result of swallowing glass contained in a bottle of Coca-Cola, which was put on the market by the defendant and purchased from a retail

grocer by the plaintiff. The case was tried on the theory of negligence of the defendant in failing to use due and proper care in the manufacture of the Coca-Cola.

We there said that courts have held the manufacturer of an article "not liable for injuries resulting in its use to those with whom it has no contractual relation;" but that "liability for injuries suffered in the consumption of food preparations is an exception equally well recognized." We adopted neither view; but affirmed the trial court upon the ground that the bottling company was guilty of negligence. This holding was followed and approved in *Middlesboro Coca-Cola Bottling Works* v. *Campbell*, 179 Va. 693, 699, 20 S. E. 2d 479.

In *Colonna* v. *Rosedale Dairy Company, supra,* we held that the plaintiff, the son of a man who purchased impure milk from a dairy company was not a party to the contract of purchase, and could not recover for breach of an implied warranty. We limited our holding to the facts of the case, and expressly left open the question of liability of a manufacturer who sells an original product through retail dealers to the general public.

In the cases of *Kroger Grocery & Baking Company* v. *Dunn, supra,* and in *Blythe* v. *Camp Manufacturing Company, supra,* the defendants were retail vendors and the plaintiffs were ultimate consumers.

In the *Blythe* case, *supra,* we held that the plaintiff failed to show that the beverage involved was bought by him or by an agent for his own use. In that case, it was unnecessary to pass upon the precise question now before us.

In *Gleason & Company* v. *International Harvester Company, et al.,* 197 Va. 255, 88 S. E. 2d 904, the alleged warranty of a defective piece of machinery was involved. The facts of that case are wholly different from those here. The action was brought for breach of warranty, and for negligence, and the evidence showed that Harvester was neither negligent, nor guilty of a breach of contract. 197 Va. page 256.

The statement in the opinion in that case, by the author of this opinion, that "So far as Harvester is concerned, want of privity of contract with Richardson is a complete defense to the charge that it was guilty of the breach of an implied warranty," was too broad, general, and unnecessary in the decision of the case. The rule applying to the sale of foodstuffs was not considered in the briefs, the argument, or the opinion.

In *E. I. duPont de Nemours & Company* v. *Universal Moulded*

*Products Corporation,* 191 Va. 525, 62 S. E. 2d 233, the issue was between the manufacturer and the ultimate consumer, and lack of privity of contract was not in question. That decision is in point only because we there held that a count for breach of implied contract, in view of its nature, may be joined with counts alleging fraud and negligence, when the demand of the plaintiff arises out of the same general cause of action, in a continuous course of dealing with reference to one right, and one judgment can be given.

■ The precise question whether a non-negligent manufacturer of food, who supplies the same to a retailer for resale for human consumption, is liable to the ultimate consumer for injuries sustained by him as a result of eating such food, shown to be unwholesome at the time it left the manufacturer's possession, has not heretofore been presented to this Court.

The authorities are in conflict. There is a great contrariety of opinion and reasons. Many courts have denied recovery by the ultimate consumer against the manufacturer, insisting strictly on the requirement of privity where the action is for a breach of the warranty. Other courts, however, disregard the requirement of privity and hold the manufacturer liable directly to the consumer, although there is no contractual relation between them. *Decker & Sons, Inc.* v. *Capps,* 139 Tex. 609, 164 S. W. 2d 828; 142 A. L. R. 1479; 22 Am. Jur., Food, § 104, page 890; 36 C. J. S., Food, § 58, page 1106. See also 77 C. J. S., Sales, § 305 (b) 3, page 1127.

Many of the courts in order to circumvent the privity rule have done so by indulging in legal fictions, such as fraud; deceit; assignment of cause of action from dealer to consumer; third party beneficiary contract; and agency of the buyer for the consumer. Jeanblanc, "Manufacturer's Liability to Persons other than their immediate Vendees," 24 Va. L. Rev. 134, 158. Other courts have imposed on the manufacturer and vendee an implied warranty, which is said to run with the article. *Coca-Cola Bottling Company of Ft. Worth* v. *Smith,* (Tex. Civ. App.), 97 S. W. 2d 761.

Some courts reason that the remedies of injured customers ought not to depend upon the intricacies of the law of sales, nor the obligation of the manufacturer based only upon privity of contract; but should because of the demands of justice and social welfare rest upon the ground of a warranty and soundness imposed by law as a matter of public policy. *Decker & Sons, Inc.* v. *Capps, supra;* Annotation, 142 A. L. R. 1490, and prior annotations therein cited.

In 22 Am. Jur., Food, § 104, pages 890 and 891, this is said:

"Although there are some decisions denying recovery by a consumer from a manufacturer for injuries from food or beverages purchased through the medium of a retail dealer, the decided weight of authority is to the effect that an ultimate consumer who purchases, from a retailer or middleman, food products or beverages prepared by a manufacturer or packer, such as those put up in bottles, sealed cans or sealed packages, may bring an action directly against the manufacturer or packer for injuries resulting from the use of such foods and beverages which prove to be unwholesome and unfit for human consumption, even though there is no contractual relation between the consumer and the manufacturer or packer. The superior position of the manufacturer in respect of knowledge, and opportunity for knowledge, of the contents of the cans and of the processes of manufacture seems to have strongly influenced the courts in holding him liable, irrespective of the theory upon which a particular action is based.

"Where the manufacturer puts the goods upon the market in sealed cans or packages, he in effect represents to each purchaser that the contents of each can or package are suited to the purpose for which such can or package is sold. * * *"

See to the same effect 36 C. J. S., Food, § 59, page 1107 and 77 C. J. S., Sales, § 305b(3), page 1127.

The facts in *Decker & Sons, Inc.* v. *Capps, supra,* are similar to those in the present case. There the defendant manufactured sausage, advertised as being suitable for human consumption under the trade name "Cervalet." The sausage, wrapped in a cellophane package, was sold by it to a retail grocer, who in turn sold it three days later to C. K. Capps. Members of Capps' family, including the plaintiff, Mrs. Capps, ate it, and as a result were poisoned. The jury found that although the manufacturer was free from negligence, the sausage had become contaminated before it left its hands.

In a well reasoned opinion in the above case, Chief Justice Alexander, after reciting the historical background of and the reason for the rule that in sales of food for domestic use there is an implied warranty that it is fit and wholesome for human consumption, concluded that such warranty is imposed by operation of law as a matter of public policy for the protection of health and life. He pointed out that the manufacturer of food occupies a better position of knowledge, or opportunity for knowledge, of the contents of its

cans and sealed packages, and the processes of its manufacturer. Then said he:

"* * * A party who processes a product and gives it the appearance of being suitable for human consumption, and places it in the channels of commerce, expects some one to consume the food in reliance on its appearance that it is suitable for human consumption. He expects the appearance of suitableness to continue with the product until some one is induced to consume it as food. But a modern manufacturer or vendor does even more than this under modern practices. He not only processes the food and dresses it up so as to make it appear appetizing, but he uses the newspapers, magazines, billboards, and the radio to build up the psychology to buy and consume his products. The invitation extended by him is not only to the housewife to buy and serve his products, but to the members of the family and guest to eat it. In fact, the manufacturer's interest in the product is not terminated when he has sold it to the wholesaler. He must get it off the wholesaler's shelves before the wholesaler will buy a new supply. * * *" 142 A. L. R. page 1487.

There is no doubt about the public policy of this State with respect to the manufacture and sale of food. Code, sections 3-303 and 3-308, expressly make it unlawful to sell or expose for sale any unhealthy, unwholesome, or adulterated food for human use.

For the reasons above expressed, we are of opinion that where a manufacturer of food for human consumption sells such food, in sealed containers or packages, to a retailer, who in turn sells it to a consumer, and the consumer upon eating it suffers damage in consequence of impurities in the product, shown to have existed therein before it left the manufacturer's hands, the manufacturer is liable to the consumer on its implied warranty of wholesomeness of the food, and the consumer may recover against the manufacturer for damages suffered, irrespective of a lack of privity of contract between the manufacturer and the consumer. This permits the placing of the loss occasioned upon the manufacturer who is in the best position to prevent the production and sale of unwholesome food. We are not here concerned with the question of the liability of a manufacturer for impurities or deterioration in food which occurs after the commodity has left the manufacturer's possession.

The judgment of the trial court is affirmed.

*Affirmed.*