**Sharon Proos KOSTERS,**
**Plaintiff-Appellee,**

v.

**The SEVEN–UP COMPANY, Defendant & Third Party Plaintiff-Appellant.**

**No. 76–2527.**

United States Court of Appeals,
Sixth Circuit.

Argued April 17, 1978.

Decided March 26, 1979.

William R. DeVries, Wheeler, Upham, Bryant & Uhl, Geoffrey L. Gillis, Grand Rapids, Mich., for defendant & third party plaintiff-appellant.

Michael J. Roberts, Rhoades, McKee & Boer, Grand Rapids, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, and CELEBREZZE and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

During the past two decades, franchising has become a common means of marketing products and services, but our legal system has not yet settled the principles that define the liabilities of franchisors for injuries sustained by customers of their franchisees. This diversity case requires us to interpret the theories of tort and contract liability which Michigan law allows a jury to consider when deciding whether an injured purchaser is entitled to recover against the franchisor of a product.

## I. STATEMENT OF THE CASE

The defendant, the Seven-Up Company, appeals from a $150,000 jury verdict awarded for injuries caused by an exploding 7-Up bottle. The plaintiff removed a cardboard carton containing six bottles of 7-Up from a

grocery shelf, put it under her arm and headed for the check-out counter of the grocery store. She was blinded in one eye when a bottle slipped out of the carton, fell on the floor and exploded, causing a piece of glass to strike her eye as she looked down. The 7-Up carton was a so-called "over-the-crown" or "neck-thru" carton designed to be held from the top and made without a strip on the sides of the carton which would prevent a bottle from slipping out if held underneath.

The carton was designed and manufactured by Olinkraft, Inc. Olinkraft sold it to the Brooks Bottling Company, a franchisee of the defendant, Seven-Up Company. Seven-Up retains the right to approve the design of articles used by the bottler, including cartons. The franchise agreement between Seven-Up and the Brooks Bottling Company requires that "cases, bottles, and crowns used for 7-Up will be of a type . . . and design approved by the 7-Up Company," and "any advertising . . . material . . . must be approved by the 7-Up Company before its use by the bottler."

Using an extract provided by Seven-Up, Brooks produced the beverage and poured it into bottles. After securing Seven-Up's approval of the design under the franchise agreement, Brooks packaged the bottles in cartons selected and purchased by Brooks from various carton manufacturers, including Olinkraft. Brooks then sold cartons of 7-Up to stores in some 52 Michigan counties, including Meijers Thrifty Acres Store in Holland, Michigan, where the plaintiff picked up the carton and carried it under her arm toward the checkout counter. Plaintiff settled her claims against the bottler, the carton manufacturer and the grocer for $30,000.

Seven-Up denied liability, insisting its approval of the cartons was only of the "graphics" and for the purpose of assuring that its trademark was properly displayed. It filed a third-party complaint against the bottler, the carton manufacturer and the grocer for indemnity or contribution if plaintiff were successful against Seven-Up. Upon stipulation, the grocer was subsequently dismissed. At the beginning of trial, the District Court severed Seven-Up's third-party complaint against the bottler and the carton manufacturer.

The District Judge submitted the case to the jury on five related theories of product liability—a negligence theory, three strict liability theories and one contract theory:

1. *Negligence.*—Plaintiff may recover from a franchisor for negligence without regard to privity.

2. *"Implied Warranty."*—Plaintiff may recover from a franchisor for "breach of implied warranty of fitness" if the product in question, the 7-Up carton, was defective." [1]

3. *"Inherently Dangerous."*—Plaintiff may recover if the jury finds that 7-Up "bottles are inherently dangerous" and that the franchisor failed to warn the consumer of the danger.[2]

4. *"Opportunity to Change Design."* —Plaintiff may recover for an injury resulting from the design of a product (the 7-Up carton) if the franchisor did not

1. The District Judge conditioned Seven-Up's liability for "breach of implied warranty of fitness" upon the jury's finding that Seven-Up was a "manufacturer" or "seller"—a conclusion that required the jury to find that Seven-Up "controls the approval or disapproval of the entry into the channels of commerce" of the carbonated beverage, 7-Up, "including the totality of advertising on the carriers." After explaining that the law recognized a manufacturer's or seller's "implied warranty" that its product is "for the purpose and use intended or reasonably foreseen," and that a product is "defectively designed" if "not reasonably safe for the purpose for which it is intended," the District Judge instructed the jury that if it found plaintiff's injury was the proximate result of the "misdesign or under-design" of the 7-Up carton, it could find the carton was "defective."

2. To the extent that "all of the evidence presented has supported the proposition that [bottles] . . . containing Seven-Up carbonated beverages had a foreseeable propensity to explode upon impact," the District Judge instructed the jury that it could "find that such bottles are inherently dangerous." He further instructed the jury that a manufacturer has a "duty to warn of a known inherent danger in its product, or in its contemplated use not readily apparent to the user."

exercise an "opportunity to avoid causing injuries" by altering the design of the product.[3]

5. *Contract.*—Plaintiff may recover as a third-party beneficiary of the franchise agreement between 7-Up and the bottler.[4]

We do not know which of these theories the jury accepted because it returned a general verdict. On appeal, Seven-Up argues that all of the theories are wrong except negligence. We begin our consideration of this diversity case by acknowledging that the views of an experienced District Judge on questions concerning the law of the state in which he sits are entitled to great respect.

## II. THE LIABILITY ISSUES

### A. Implied Warranty

Under Michigan law, privity in products liability cases is now unnecessary.[5]

The jury may find a supplier of products liable, depending on the level of his awareness of the risk of harm, for negligence or for breach of an implied warranty of fitness, or both, when he distributes a "defective" product, whether manufactured by himself or another.[6] A product, may be "defective" because of a mistake in manufacture[7] or an unsafe design.[8] Whether a product is defective is normally a jury question.[9] The District Court allowed the jury to find that these liabilities of a supplier also apply to the franchisor, although in this case the Seven-Up Company did not manufacture, supply or require its franchisee to use the "neck-thru" carton.

Michigan appellate courts have not had the occasion to consider these principles in the context of franchising.[10] It appears to be a new question not generally considered

---

3. At the end of his summary of plaintiff's theories of liability, the District Judge charged:

 If you find that the Defendant Seven-Up Company had an opportunity to avoid causing injuries to the Plaintiff, Sharon Proos Kosters, by designing, inspecting, testing the containers which it approved for use by its franchisees' bottlers and failed to use this opportunity and such failure resulted in injury to the Plaintiff, the Defendant would be liable to the Plaintiff.

4. The District Judge instructed the jury that if it found the franchise agreement between Seven-Up and Brooks Bottling Co. "necessarily and directly benefitted" consumers of 7-Up, it must find that the Plaintiff was a third-party beneficiary of the contract and entitled to sue for its breach. In construing the agreement "to determine whether it places a duty upon Seven-Up to provide safe and structural[ly] sound beverage bottle containers" as well as "to determine whether the Plaintiff was a third-party beneficiary of that contract," the court instructed the jury to "look objectively at the terms and conditions of the contract." *See* note 27, *infra*, for the relevant sections of the franchise agreement.

5. *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873 (1958) (requirement of privity abandoned in products liability claims for breach of implied warranty); *Macres v. Coca-Cola Bottling Co.*, 290 Mich. 567, 287 N.W. 922 (1939) (requirement of privity abandoned in products liability claims for negligence).

6. *See Piercefield v. Remington Arms Co., Inc.*, 375 Mich. 85, 98–99, 133 N.W.2d 129, 135 (1965); *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 612, 182 N.W.2d 800, 806 (1970); *Manzoni v. Detroit Coca-Cola Bottling Co.*, 363 Mich. 235, 109 N.W.2d 918 (1961). Michigan appears to have adopted the Restatement of Torts' concept of strict liability for defective products "under the guise" of the implied warranty theory. *See Continental Cas. Co. v. Westinghouse Elec. Corp.*, 327 F.Supp. 720, 723 (E.D.Mich.1970); Restatement (Second) of Torts § 402A (1965). *See also Williams v. Detroit Edison Co.*, 63 Mich.App. 559, 568–69 n.4, 234 N.W.2d 702, 707–08 n.4 (1975); Comment, *Products Liability in Michigan: Implied Warranty, Strict Tort or Both?*, 15 Wayne L.Rev. 1558, 1564, 1573–74 n.108, 1580 (1969).

7. *See Meli v. General Motors Corp.*, 37 Mich. App. 514, 195 N.W.2d 800 (1970).

8. *See Paronson v. Construction Equip. Co.*, 386 Mich. 61, 191 N.W.2d 465 (1971). *See also Murphy v. Eaton, Yale & Towne, Inc.*, 444 F.2d 317 (6th Cir. 1971).

9. *Green v. Volkswagen of America, Inc.*, 485 F.2d 430, 434–35 (6th Cir. 1973); *Detroit & Milwaukee R. R. Co. v. Van Steinberg*, 17 Mich. 99, 120–21 (1868).

10. Michigan has, however, subjected trademark licensors to *vicarious* liability for consumers' personal injuries although the trademark licensor neither manufactured nor sold

in other jurisdictions.[11] The franchise system is a method of selling products and services identified by a particular trade name which may be associated with a patent, a trade secret, a particular product design or management expertise. The franchisee usually purchases some products from the franchisor—in this case, the 7-Up syrup—and makes royalty payments on the basis of units sold, in exchange for the right to offer products for sale under the trademark. The franchise agreement establishes the relationship between the parties and usually regulates the quality of the product, sales territory, the advertising and other details; and it usually requires that certain supplies be purchased from the franchisor.[12]

Seven-Up Company concedes that a franchisor, like a manufacturer or supplier, may be liable to the consumer for its own negligence, without regard to privity, under the doctrine of *MacPherson v. Buick Motor Co.*[13] Seven-Up contends, however, that it does not carry the liabilities of a supplier when it did not supply the product and that other theories of strict tort liability do not apply. Liability may not be laid on the basis of implied warranty, it says, when the franchisor did not manufacture, handle, design or require the use of the particular

product. The precise question before us here is whether Michigan's principles of "strict accountability"[14] for breach of implied warranty extend to a franchisor who retains the right of control over the product (the carton) and specifically consents to its distribution in the form sold but does not actually manufacture, sell, handle, ship or require the use of the product.

Different questions may arise in other franchising contexts. In some instances, the franchisor may not retain the right of control or may not actually approve the form of the product. The franchisee may sell a product contrary to the instructions or without the knowledge of the franchisor. The consumer may attempt to hold the franchisor liable for the conduct of the franchisee under the agency doctrines of *respondeat superior* or apparent authority. We do not deal with these questions here.[15]

■ In this case, the Seven-Up Company not only floated its franchisee and the bottles of its carbonated soft drink into the so-called "stream of commerce."[16] The Company also assumed and exercised a degree of control over the "type, style, size and design" of the carton in which its prod-

the product directly to the ultimate consumer. *See Clark v. Texaco, Inc.*, 55 Mich.App. 100, 222 N.W.2d 52 (1974); *Johnston v. America Oil Co.*, 51 Mich.App. 646, 215 N.W.2d 719 (1974). *See also Sanders v. Clark Oil Refining Co.*, 57 Mich.App. 687, 226 N.W.2d 695 (1975). In the instant case, plaintiff's settlement with the bottler would arguably release Seven-Up from vicarious liability for the bottler's conduct. *See Drinkard v. William J. Pulte, Inc.*, 48 Mich.App. 67, 210 N.W.2d 137 (1973).

11. *But see City of Hartford v. Associated Constr. Co.*, 34 Conn.Supp. 204, 384 A.2d 390 (1978) (trademark licensor held liable under principles of strict liability for property damage caused by defective roofing base product mixed, sold and applied by trademark licensee); *Kasel v. Remington Arms Co., Inc.*, 24 Cal. App.3d 711, 101 Cal.Rptr. 314 (1972) (trademark licensor held liable under principles of strict liability in tort for personal injuries caused by defective shell manufactured by its trademark licensee). *See also Carter v. Bancroft & Sons Co.*, 360 F.Supp. 1103 (E.D.Pa. 1973) (trademark licensor a "seller" within meaning of Pennsylvania law).

12. *See generally* Brown, *Franchising—A Fiduciary Relationship*, 49 Tex.L.Rev. 650 (1971); Note, *Liability of a Franchisor for Acts of a Franchisee*, 14 So.Cal.L.Rev. 143, 143–49 (1968).

13. 217 N.Y. 382, 111 N.E. 1050 (1916). *Accord, Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959).

14. *Cook v. Darling*, 160 Mich. 475, 481, 125 N.W. 411 (1910).

15. *See Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3d Cir. 1978) (franchisor of drug stores may be liable under doctrines of *respondeat superior* and apparent authority for death caused by druggist's error in filling prescription); Note, *Liability of a Franchisor for Acts of a Franchisee, supra* note 12, at 143–49.

16. *See Kasel v. Remington Arms Co., Inc.*, 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972). *See also Williams v. Detroit Edison Co.*, 63 Mich. App. 559, 568, 234 N.W.2d 702, 707 (1975).

uct was to be marketed.[17] The carton was submitted to Seven-Up for inspection. With knowledge of its design, Seven-Up consented to the entry in commerce of the carton from which the bottle fell, causing the injury. The franchisor's sponsorship, management and control of the system for distributing 7-Up, plus its specific consent to the use of the carton, in our view, places the franchisor in the position of a supplier of the product for purposes of tort liability.

We are not saying that the Seven-Up Company is absolutely liable as an insurer of the safety of the carton under the theory of implied warranty, simply by virtue of its status as a franchisor.[18] In the first place, under Michigan's theory of implied warranty of fitness, the carton must be found to be "defective," or as the District Judge more accurately put it, "not reasonably safe."[19] It must be harmful or unsafe because something is wrong with it, and the jury must so find. Moreover, here the franchisor inspected the carton and approved it. Thus, we need not reach the question whether the franchisor would carry the liabilities of a supplier if it had not been made aware of the product and given the opportunity to assess the risks.

■ When a franchisor consents to the distribution of a defective product bearing its name, the obligation of the franchisor to compensate the injured consumer for breach of implied warranty, we think, arises from several factors in combination: (1) the risk created by approving for distribution an unsafe product likely to cause injury, (2) the franchisor's ability and opportunity to eliminate the unsafe character of the product and prevent the loss, (3) the consumer's lack of knowledge of the danger, and (4) the consumer's reliance on the trade name which gives the intended impression that the franchisor is responsible for and stands behind the product.[20] Liability is based on the franchisor's control and the public's assumption, induced by the franchisor's conduct, that it does in fact control and vouch for the product.

These are factors Michigan courts have relied on in the past in determining who may be held liable for breach of implied warranty of fitness in other products liability situations.[21] We believe Michigan courts would apply these principles in the franchising situation presented by this case, and we therefore conclude that the case was correctly submitted to the jury to assess liability for breach of implied warranty.[22]

## B. Liability Based on "Inherently Dangerous" Product

■ The District Court instructed the jury that it could also find that "carbonated beverages . . . bottles are inherently

---

**17.** See the language of the franchise agreement infra at note 27.

**18.** See Restatement (Second) of Torts § 402A (1965). See generally, Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825 (1973).

**19.** District Judge's charge on implied warranty theory, supra at note 1. See Piercefield v. Remington Arms Co., Inc., 375 Mich. 85, 98–99, 133 N.W.2d 129, 135 (1965); Cova v. Harley Davidson Motor Co., 26 Mich.App. 602, 612, 182 N.W.2d 800, 806 (1970). See generally Wade, Strict Tort Liability for Products, supra note 18.

**20.** See Wade, Strict Tort Liability for Products, supra note 18; Restatement (Second) of Torts § 402A, Comment c (1965).

**21.** See, e. g., Turner v. Bituminous Cas. Co., 397 Mich. 406, 244 N.W.2d 873 (1976); Piercefield v. Remington Arms Co., Inc., 375 Mich.

85, 133 N.W.2d 129 (1965); Livesley v. Continental Motors Corp., 331 Mich. 434, 49 N.W.2d 365 (1951); Dooms v. Stewart Bolling & Co., 68 Mich.App. 5, 241 N.W.2d 738 (1976); Cova v. Harley Davidson Motor Co., 26 Mich.App. 602, 182 N.W.2d 800 (1970); Serijanian v. Associated Material & Supply Co., 7 Mich.App. 725, 151 N.W.2d 345 (1967).

**22.** On the record before us in this case, there appears to be no reasonable basis for the franchisor to dispute its right to control and its consent to the distribution of the carton in commerce. In such a case, the Court need not put to the jury the preliminary question whether the franchisor has sufficient control to justify liabilities based on implied warranty under Michigan law. The parties have not raised or briefed the question whether this is an issue for the court or for the jury to decide when it is disputed, and we do not decide this question.

dangerous" and, if so, that a franchisor in the position of a supplier has "a duty to warn of a known inherent danger in its product . . . not readily apparent to the user."

We can find no basis for suggesting that Michigan courts will extend the standard of absolute liability for "inherently dangerous" activity to the distribution of bottles containing carbonated beverages. The Michigan cases imposing absolute liability for "extra-hazardous" or "inherently dangerous" activity have, in the main, involved blasting, the collection of a quantity of water in a dangerous location, storage of inflammable liquids, and like activities.[23] Michigan courts and federal courts applying Michigan law have apparently declined to extend this standard to flooding due to a dam in the natural bed of a stream,[24] or to the production and sale of electricity,[25] and have always based liability in exploding bottle cases on negligence or implied warranty.[26] We therefore think it was error for the court to instruct the jury that it could hold Seven-Up liable on a theory of absolute liability for engaging in "inherently dangerous" activity.

### C. Instruction on "Opportunity to Change Design"

 The District Court's instruction on the defendant's opportunity to change the design of the 7-Up carton also raises problems. The Court told the jury that plaintiff could recover if Seven-Up "had an opportunity to avoid causing injuries" by changing the design and "failed to use this opportunity." We agree that the opportunity to eliminate the harm is a proper consideration for the jury in considering the negligence and implied warranty theories. But this paragraph was submitted by the plaintiff as a separate instruction and was given by the Court, for some reason, after its summary of plaintiff's third-party beneficiary theory of liability.

The difficulty with the "opportunity to change the design" instruction is that it is not stated as a factor to be considered in connection with the negligence and implied warranty theories to which it logically relates. Read as a separate charge, it could be understood as directing a verdict for the plaintiff if the jury found that the defendant had the opportunity to change the design and eliminate the risk of injury. In this portion of the court's charge, the jury was not told that to impose liability it must also find the crucial element that the product was defective or not reasonably safe.

It may be that the District Court, and the jury, understood that this element of defectiveness was implicit in the words "opportunity to avoid causing injuries." But it is equally likely that the jury understood the instruction to permit a finding of liability simply because Seven-Up failed to make the carton accident-proof even though the carton was not "defective." As we have already said, we do not believe Michigan law goes this far. It does not establish a standard of absolute liability or make the supplier an insurer against accidents caused by ordinary products.

### D. Third-Party Beneficiary Claim

 The District Court erred in instructing the jury on plaintiff's third-party bene-

---

**23.** *White v. McLouth Steel Corp.*, 18 Mich.App. 688, 171 N.W.2d 602 (1969); *Smith v. Chippewa County Road Comm'rs.*, 5 Mich.App. 370, 146 N.W.2d 702 (1966), *aff'd*, 381 Mich. 363, 161 N.W.2d 561 (1968); *Whittemore v. Baxter Laundry Co.*, 181 Mich. 564, 148 N.W. 437 (1914). *See also Mulcahy v. Argo Steel Constr. Co.*, 4 Mich.App. 116, 144 N.W.2d 614 (1966). For a listing of the factors to be weighed in determining whether an activity is abnormally dangerous *see* Restatement (Second) of Torts § 520 (1977).

**24.** *McHenry v. Ford Motor Co.*, 146 F.Supp. 896 (E.D.Mich.1956), *aff'd*, 261 F.2d 833 (6th Cir. 1959).

**25.** *See Insurance Co. of No. America v. Radiant Elec. Co.*, 55 Mich.App. 410, 222 N.W.2d 323 (1974); *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.*, 38 Mich.App. 325, 196 N.W.2d 316 (1972).

**26.** *See, e.g., Pattinson v. Coca-Cola Bottling Co.*, 333 Mich. 253, 52 N.W.2d 688 (1952); *Macres v. Coca-Cola Bottling Co.*, 290 Mich. 567, 287 N.W. 922 (1939).

ficiary theory. Based upon the franchise agreement between Seven-Up and the bottler, plaintiff claimed that Seven-Up implicitly promised to arrange for safe cartons for the benefit of consumers such as the plaintiff.

It is clear from the contract itself [27] and the evidence in the record that the bottler did not extract a promise from Seven-Up to perform actions directly benefiting consumers such as the plaintiff; rather, Seven-Up imposed on the bottler only the duty of submitting packaging materials to Seven-Up for approval. There is no indication that the bottler failed to submit the designs for approval, as requested by Seven-Up, or that Seven-Up failed to approve the designs, as requested by the bottler. The franchise agreement simply cannot be read to include any promise by Seven-Up to the bottler to provide or arrange for safe cartons. Recent Michigan cases, which appear to expand third-party beneficiary liability to persons foreseeably if not intentionally benefited by a promise,[28] do not affect the conclusion that Seven-Up has made no such promise under the agreement.

### E. Conclusions on Liability Issues

We conclude that the three instructions we have criticized, taken together, constitute reversible error. The "inherently dangerous activity" instruction and the "op-portunity to change design" instruction permitted the jury to hold Seven-Up liable without a finding that the carton was "defective," contrary to Michigan products liability principles. Neither the law nor the facts justified a "third-party beneficiary" instruction. Although the case was properly submitted to the jury on both negligence and breach of implied warranty theories, there is no way of knowing whether the jury's verdict was based on one of these theories or on one of the theories embodied in the erroneous instructions. The jury may have made the defendant pay for creating a type of risk that Michigan law does not find sufficiently blameworthy to try to prevent or control by requiring compensation.[29] We therefore reverse and remand the case for a new trial.

### III. SEVERANCE OF SEVEN–UP'S THIRD–PARTY CLAIM FOR INDEMNITY OR CONTRIBUTION

In light of our disposition of this appeal on the issues of liability, the only other question we need to consider is the question of severance on retrial of the case. Seven-Up argues that the third-party claims should not have been severed. We disagree.

The District Court did not abuse its discretion under Rules 14(a) [30] and 42(b),[31] Fed. R.Civ.P., in severing for separate trial Sev-

---

**27.** The relevant sections of the franchise agreement provide:

> 3. Advertising and promotion material offered by the 7-Up Company to all its bottlers will be purchased and used according to plans discussed and agreed upon from time to time. Any advertising or promotion material other than that obtained from the 7-Up Company must be approved by the 7-Up Company before its use by the bottler.
> 4. *Cases, bottles, and crowns used for 7-Up will be of a type, style, size and design approved by the 7-Up Company.* No non-standard bottles or crowns will be used except with the written permission of the 7-Up Company. 7-Up will be sold in 7-Up cases at all times, but non-competitive drinks may be sold in 7-Up cases, if such drinks are permitted under paragraph two above. Delivery trucks for 7-Up will be decorated in standard 7-Up colors and according to approved designs. Proper identification for 7-Up will be

> maintained on the bottling plant at all times and uniforms of all employees will carry approved 7-Up emblems. (Emphasis added.)

**28.** *See, e. g., Talucci v. Archambault*, 20 Mich. App. 153, 173 N.W.2d 740 (1969).

**29.** *See* Keeton, *Conditional Fault in the Law of Torts*, 72 Harv.L.Rev. 401 (1959); Wade, *Strict Liability For Products, supra* note 18.

**30.** "Any party may move to strike the third-party claim, or for its severance or separate trial."

**31.** "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim . . . or third-party claim, or of any separate issue or of any number of claims . . . third-party claims, or issues . . . .."

en-Up's third-party claim against the bottling company and the carton manufacturer. Presentation of the case in a joint trial, including presentation of the third-party indemnity and contribution claims, could require the parties, the jury and the court to address and consider the following basic issues: (1) Seven-Up's liability on theories of negligence and breach of implied warranty; (2) if Seven-Up is liable, the amount of damages to be awarded against it; (3) the liabilities of the bottler and the carton manufacturer for negligence and breach of implied warranty, if Seven-Up is found liable; (4) if liability is established against Seven-Up *and* either the bottler or the carton manufacturer, or both, the responsibility of the other parties either to indemnify Seven-Up or to bear an equal share of the damages under principles of contribution.

Although it might have been possible to handle this situation by devising provisional questions for the jury to answer in the form of special verdicts, or by bifurcating or trifurcating the trial, the District Judge determined that such a procedure would unduly complicate the trial and lead to confusion. He was required to balance the convenience and economy to be gained by conducting a single trial against the complexity of the legal theories which the jury would have to understand in order to decide the case properly, the possibility of inconsistent verdicts, and the possibility that the jury would misunderstand the role of the third-party defendants at the trial. The District Judge was no doubt aware of the confusion that surrounds questions of indemnity and contribution in products liability cases and the difficulty of clarifying the factors that the jury would have to consider in deciding

between indemnity and contribution.[32] For these reasons, and for the additional reasons discussed by Chief Judge Phillips in *Dewald v. Minster Press Co.*, 494 F.2d 795 (6th Cir. 1974), the trial judge did not abuse his discretion in ordering a separate trial on the third-party complaint.[33]

For the reasons stated above, the judgment entered on the jury verdict is reversed and the case is remanded to the District Court for a new trial.

---

**32.** For discussion of the factors to be taken into account in deciding between indemnity and contributions, see *Italia Societa v. Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1963); *Union Stock Yards Co. v. Chicago, Burlington & Quincy R. R. Co.*, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453 (1905); *Dale v. Whiteman*, 388 Mich. 698, 202 N.W.2d 797 (1972); Restatement (Second) of Torts § 886B(2)(e) (Tent. Draft No. 16, 1970); Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases*, 58 Minn.L.Rev. 723 (1974); Phillips, *Contribu-*

*tion and Indemnity in Products Liability*, 42 Tenn.L.Rev. 85 (1974); Note, *The Right to Indemnity in Products Liability Cases*, 1964 Ill. L.F. 614; Annot., 28 A.L.R.3d 943 (1969).

**33.** On the question of the treatment of the $30,000 settlement between plaintiff and Brooks, Olinkraft and Meijers, should the plaintiff again receive a verdict, Michigan law requires that the judgment be reduced by this amount. See *Laster v. Gottschalk*, 75 Mich. App. 290, 255 N.W.2d 210 (1977).