**Linda HARRIS, Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA, a/k/a Alcoa and the Coca-Cola Company, a/k/a Coca-Cola Company, U.S.A., Defendants.**

Civ. A. No. 81–0139(D).

United States District Court, W.D. Virginia, Danville Division.

Oct. 19, 1982.

Robert W. Mann, Martinsville, Va., for plaintiff.

Meade, Tate & Daniel, Danville, Va., for Aluminum Company of America.

John H. Locke, Gentry, Locke, Rakes & Moore, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff, Linda Harris, brought this products liability action against Aluminum Company of America, a/k/a Alcoa, and The Coca-Cola Company, a/k/a Coca-Cola Company, U.S.A. ("Coca-Cola") alleging negligence and breaches of the implied warranties of merchantability and fitness for a particular purpose. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a)(1). This matter is now before this court on Coca-Cola's motions to dismiss plaintiff's warranty and vicarious liability allegations for failure to state claims upon which relief can be granted under Virginia law.

Plaintiff alleges that on October 9, 1979, she was blinded in one eye when the twist-off aluminum cap on a plastic bottle of Coca-Cola soft drink blew off the bottle and struck her in the eye as she commenced to remove the cap. After first giving notice of her claim, plaintiff brought suit in the Circuit Court of Henry County, Virginia, against Coca-Cola, Alcoa, Wometco Coca-Cola Bottling Company of Roanoke, Virginia ("Wometco"), and Winn-Dixie Raleigh, Inc. ("Winn-Dixie"). However, plaintiff subsequently entered into a Covenant Not to Sue with Wometco and Winn-Dixie in consideration of the sum of $87,500, and thereafter took a voluntary nonsuit in the state court action as to these defendants. On October 7, 1980, plaintiff filed suit in this court against Coca-Cola and Alcoa. And on August 26, 1981, plaintiff also non-

suited the state court action with respect to Coca-Cola and Alcoa.

Plaintiff's theories of recovery against Coca-Cola are that the aluminum cap was defective in that it was improperly threaded, and that Coca-Cola, acting by itself and through its agents, 1) was negligent in marketing the allegedly dangerously defective soft drink package and in failing to warn the public and plaintiff of the known dangerous propensities of the aluminum closure cap, and 2) breached its implied warranties that the soft drink package, including the twist-off cap, was of merchantable quality and fit for a particular purpose. In support of her contention that Coca-Cola impliedly warranted the merchantability and fitness for a particular purpose of the soft drink package, plaintiff alleges that Coca-Cola is in the business of causing soft drink packages of cola drink to be sold pursuant to a world wide advertising program. And that in connection with its sales of coke syrup (which goes into the cola drink) to individual franchised bottlers, Coca-Cola prescribes requirements and specifications as to how the beverage will be bottled and labeled. Finally, plaintiff contends that the bottle cap in question has imprinted thereon "Bottled under the authority of The Coca-Cola Company . . . ."

Coca-Cola has moved to dismiss plaintiff's warranty claims against it on the ground that they do not state any claims upon which plaintiff is entitled to relief under Virginia law. Coca-Cola argues that under Virginia law, the implied warranties of merchantability and fitness for a particular purpose, (Va.Code §§ 8.2–314 and –315 (1965 Added Vol.)), are made only when a sale of goods occurs, that is, when title to goods passes from the seller to the buyer for a price. *Moore v. Allied Chemical Corp.,* 480 F.Supp. 364, 375 (E.D.Va.1979). Because Coca-Cola sold only the coke syrup and its franchised bottler did everything else, Coca-Cola reasons that it did not sell the soft drink package to anyone, and therefore, that it could not have impliedly warranted the merchantability or fitness for a particular purpose of the soft drink package under Virginia law. Coca-Cola

also contends that any claim that it is liable for causing a defective product to be placed in the stream of commerce, when there is no actual sale of such product by Coca-Cola, can only be based upon the doctrine of strict liability in tort, which is not recognized in Virginia. Finally, Coca-Cola asserts that Virginia's anti-privity statute, (Va.Code 8.2–318 (1965 Added Vol.)), abolishes only the defense of "horizontal" privity of contract, and therefore, that Coca-Cola has a "vertical" privity defense in that it did not sell the soft drink package to plaintiff.

When ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must take all allegations in the challenged complaint as admitted, and the pleading should be dismissed "only where it is clear and apparent to the court that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of the specific claim." *Tahir Erk v. Glenn L. Martin Co.,* 116 F.2d 865, 870 (4th Cir.1941). In addition, because this is a diversity action, the motion at bar must be decided by applying the law of the forum. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937). The Supreme Court of Virginia has not, however, addressed the question whether principles of implied warranty extend to a franchisor who is involved with the marketing of an allegedly defective soft drink package but does not actually manufacture or sell the product. As this is a question of first impression in Virginia, this court must attempt to predict how the Supreme Court of Virginia would resolve this issue. *GAF Corp. v. County School Board of Washington County, Virginia,* 629 F.2d 981 (4th Cir.1980); *Perdue v. Sears, Roebuck & Co.,* 523 F.Supp. 203, 205 (W.D. Va.1981).

■ Initially, the court notes that Coca-Cola's contention that it may assert the defense of vertical privity against plaintiff is clearly not the law in Virginia. *See Brockett v. Harrell Bros. Inc.,* 206 Va. 457, 143 S.E.2d 897 (1965). Coca-Cola's other

arguments in support of this motion do, however, seem to have merit as it is difficult to fit plaintiff's allegations within a literal reading of Va.Code §§ 8.2–314 and –315. Nevertheless, Comment 2 to Code § 8.2–313 notes that "the warranty sections of [Article 2] are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined ... to sales contracts." Thus, even if plaintiff's allegations do not state a claim upon which relief can be granted under Va.Code §§ 8.2–314 and –315, this court must also consider whether plaintiff's allegations are sufficient to state a common law implied warranty claim under Virginia law before ruling on Coca-Cola's Rule 12(b)(6) motion.

Although research indicates that the Supreme Court of Virginia has never addressed this question, there is authority holding that implied warranty principles do extend to franchisors who promote the sale of soft drink products but do not actually manufacture or sell the product. In *Kosters v. Seven-Up Company,* 595 F.2d 347 (6th Cir.1979), the plaintiff was blinded in one eye when a bottle of 7-Up slipped out of an allegedly defective carton, fell to the floor and exploded, causing glass to strike the plaintiff's eye. The carton was designed and manufactured by a third company who sold it to a franchisee of Seven-Up, but Seven-Up retained the right to approve the design used by the bottler, including cartons. And "[w]ith knowledge of its design, Seven-Up consented to the entry in commerce of the carton from which the bottle fell, causing the injury." *Id.* at 353. The plaintiff settled her claims against the bottler, the carton manufacturer and the retailer, but sued Seven-Up alleging, among other things, "breach of implied warranty of fitness" in that the 7-Up carton was defective.

> Seven-Up denied liability and argued that its approval of the cartons was only ... for the purpose of assuring that its trademark was properly displayed, [and] that it does not carry the liabilities of a supplier when it did not supply the product

> .... Liability may not be laid on the basis of implied warranty, it says, when the franchisor did not manufacture, handle, design or require the use of the particular product.

*Id.* at 351–352. Nevertheless, the Sixth Circuit Court of Appeals ruled that a franchisor is obligated to compensate the injured consumer for breach of implied warranty when a franchisor consents to the distribution of a defective product bearing its name. *Id.* at 353. The court of appeals stated that this obligation

> arises from several factors in combination: 1) the risk created by approving for distribution an unsafe product likely to cause injury, 2) the franchisor's ability and opportunity to eliminate the unsafe character of the product and prevent the loss, 3) the consumer's lack of knowledge of the danger, and 4) the consumer's reliance on the trade name which gives the intended impression that the franchisor is responsible and stands behind the product. Liability is based on the franchisor's control and the public's assumption, induced by the franchisor's conduct, that it does in fact control and vouch for the product.

*Id.*

This court, of course, is not bound by the Sixth Circuit's interpretation of Michigan law in *Kosters,* but must instead attempt to ascertain whether Virginia courts would extend such warranty principles to Coca-Cola in this case. Fortunately, the court is aided in its endeavor to predict developing Virginia law by the decision of the Supreme Court of Virginia in *Swift & Co. v. Wells,* 201 Va. 213, 110 S.E.2d 203 (1959).

*Swift & Co.* was decided before Virginia enacted the Uniform Commercial Code. Prior to this decision, Virginia had followed the common law doctrine that a seller of foodstuff for human consumption could be liable on an implied warranty of fitness and wholesomeness for such purpose where there was privity of contract between the vendor and vendee. 110 S.E.2d at 206. However, the court in *Swift & Co.* held that a manufacturer of food could be held liable

on its implied warranty of wholesomeness of the food, irrespective of a lack of privity of contract between the manufacturer and the consumer, if the food contained impurities before it left the manufacturer's control. 110 S.E.2d at 208–209. In so holding, the Supreme Court of Virginia noted that "the manufacturer of food occupies a better position of knowledge, or opportunity for knowledge, of the contents of its cans and sealed packages, and the processes of its manufacture." 110 S.E.2d at 208. The court also quoted with approval the following portion of Chief Justice Alexander's opinion in *Decker & Sons, Inc. v. Capps,* 139 Tex. 609, 619, 164 S.W.2d 828, 832 (1942):

> A party who processes a product and gives it the appearance of being suitable for human consumption, and places it in the channels of commerce, expects some one to consume the food in reliance on its appearance that it is suitable for human consumption. He expects the appearance of suitableness to continue with the product until some one is induced to consume it as food. But a modern manufacturer or vendor does even more than this under modern practices. He not only processes the food and dresses it up so as to make it appear appetizing, but he uses the newspapers, magazines, billboards, and the radio to build up the psychology to buy and consume his products.

Finally, the Supreme Court of Virginia explained that its holding "permits the placing of the loss occasioned upon the manufacturer who is in the best position to prevent the production and sale of unwholesome food. 110 S.E.2d at 209.

Although *Smith & Co.* dealt with the implied warranty liability of a manufacturer of foods in the absence of privity of contract with the injured consumer, and *Kosters* concerned the implied warranty liability of a franchisor of soft drinks, the courts in both cases considered some of the same factors in determining whether implied warranty liability was appropriate. These factors were 1) the defendant's responsibility for placing the products in the stream of commerce, 2) the defendant's ability to prevent the loss by eliminating the defective character of the product, and 3) the consumer's reliance on the defendant's actions.

■ Although the "Supreme Court of Virginia has [traditionally] indicated that an action for personal injuries caused by breach of warranty should be based on the contract of sale," *Matthews v. Ford Motor Co.,* 479 F.2d 399, 401 n. 2 (4th Cir.1973), the similarity of some of the factors considered in *Kosters* to the factors considered in *Swift & Co.,* and the consumer-protection purpose of the developing implied warranty doctrine, convinces this court that the Supreme Court of Virginia, in the development of its products doctrine, would apply implied warranty principles to a franchisor who causes a product to enter the stream of commerce, engages in extensive advertising to promote the sales of the product, and controls the specifications and requirements of the product. Whether application of such warranty principles is based in tort or contract is immaterial. "The standard of safety of goods imposed on the seller or manufacturer of a product is essentially the same whether the theory of liability is labelled warranty or negligence or strict tort liability . . . ." *Chesnut v. Ford Motor Company,* 445 F.2d 967, 968 (4th Cir.1971). Under either theory "the plaintiff must show, 1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose; and 2) that the unreasonably dangerous condition existed when the goods left the defendant's hands." *Logan v. Montgomery Ward & Co.,* 216 Va. 425, 219 S.E.2d 685, 687 (1975). By analogy, if a soft drink package was unreasonably dangerous for its ordinary use, and that unreasonably dangerous condition existed when the bottling requirements of the soft drink package were under the franchisor's control, then implied warranty liability would lie against the franchisor. Accordingly, Coca-Cola's motion to dismiss plaintiff's implied warranty allegations for failure to state a claim upon which relief can be granted under Virginia law will be denied.

Coca-Cola also moves to dismiss Counts I, II and III of plaintiff's complaint to the extent they allege that Coca-Cola is vicariously liable. Coca-Cola argues that these allegations fail to state a claim upon which relief can be granted because plaintiff's prior settlement with Winn-Dixie and Wometco, (Coca-Cola's alleged agent), extinguished Coca-Cola's alleged vicarious liability. In the alternative, Coca-Cola asks that any judgment that may be rendered against it be reduced by the amount of plaintiff's settlement with Wometco and Winn-Dixie.

Plaintiff entered into a Covenant Not to Sue with Wometco and Winn-Dixie in consideration of the sum of $87,500. In this covenant, plaintiff agreed to forebear from instituting any suit against Wometco or Winn-Dixie, but expressly reserved what claims she might have against any persons other than Wometco and Winn-Dixie. Plaintiff also agreed that, in the event she recovered a judgment against either Alcoa or Coca-Cola, and that either or both of those parties in turn recovered a judgment against Wometco or Winn-Dixie, by way of contribution or indemnification, she would reimburse the covenantees to the extent of Alcoa's or Coca-Cola's recovery against them.

Plaintiff's covenant with Wometco and Winn-Dixie was executed pursuant to Va. Code § 8.01–35.1 (1982 Cum.Supp.) which states, in pertinent part, as follows:

Effect of release or covenant not to sue in respect to liability and contribution among joint tortfeasors.—A. When a release or a covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury, or the same property damage or the same wrongful death:

1. It shall not discharge any of the other tortfeasors from liability for the injury, property damage or wrongful death unless its terms so provide; but any amount recovered against the other tortfeasors or any one of them shall be reduced by any amount stipulated by the covenant, or in the amount of the consideration paid for it, whichever is the greater.

2. It shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

This motion also raises an issue of first impression in Virginia. That is, whether a covenant not to sue given to an alleged agent pursuant to Va.Code § 8.01–35.1 releases the alleged principal from any vicarious liability based upon the acts of the alleged agent. This issue, however, has arisen in other courts, and there is a split of authority on the issue. Some jurisdictions hold that a covenant not to sue the agent also releases the principal, despite language in the covenant or a statute that the covenant does not discharge any other tortfeasor. See, e.g., Dickey v. Estate of Meier, 188 Neb. 420, 197 N.W.2d 385 (1972); Craven v. Lawson, Tenn., 534 S.W.2d 653 (1976). Other courts have ruled that a covenant not to sue the agent does not release the master from vicarious liability where the covenant contains no language discharging the master. See, e.g., Alaska Airlines, Inc. v. Sweat, 568 P.2d 916 (Alaska 1977); Ritter v. Technicolor Corp., 27 Cal. App.3d 152, 103 Cal.Rptr. 686 (1972); Holve v. Draper, 95 Idaho 193, 505 P.2d 1265 (1973); Smith v. Raparot, 101 R.I. 565, 225 A.2d 666 (1967).

Coca-Cola urges this court to follow the reasoning of the Supreme Court of Tennessee in Craven v. Lawson, supra. In Craven, the Tennessee court held that:

Where no right of contribution exists, the act does not purport to intrude. Thus, the section providing that a covenant not to sue discharges the covenantee from contribution and does not discharge any other tortfeasor, has no application to the master-servant, principal-agent relationship, where liability is solely derivative.

534 S.W.2d at 656. Like Va.Code § 8.01–35.1, the covenant act construed in Craven was modeled after section 4 of the 1955 Uniform Contribution Among Tortfeasors Act. But the Tennessee Supreme Court's interpretation that the Tennessee Legislature did not intend to include derivative or vicarious liability within the scope of the

act was based on the following subsection found in the Tennessee statute:

> This chapter does not impair any right of indemnity under existing law. Where one tortfeasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of his indemnity obligation.

Tenn.Code Ann. § 23–3102(f). Apparently, this section and the language in the act which states that the covenant "discharges the tort-feasor to whom it is given from all liability for contribution to any other tortfeasor," led the court to conclude that the act does not apply where no right of contribution exists. In other words, "the court reasoned that any covenant not to sue given to an employee would also release the vicariously liable employer since their relationship invoked a right to full indemnity." Comment, *The Covenant Not to Sue: Virginia's Efforts to Bury the Common Law Rule Regarding the Release of Joint Tortfeasors*, 14 U.Rich.L.Rev. 809, 832 (1980).

This court, however, is not persuaded that the Supreme Court of Virginia would adopt the reasoning in *Craven*. In the first place, the rights of indemnity and contribution have nothing to do with the rights of the injured party. Indeed, the pertinent indemnity section interpreted in *Craven* "can be seen as merely defining the rights among tortfeasors without referring to any rights the injured party may have against defendants." Comment, 14 U.Rich.L.Rev. at 833. In addition,

> [t]he release provisions of the act, which deal mainly with the rights of the injured party against alleged tortfeasors, could well be held to apply to the master-servant or principal-agent relationship, since the parties in such relationships appear to fall within the Act, which applies to "two (2) or more persons liable in tort for the same injury or wrongful death."

Note, *Torts-Vicarious Liability-Covenant Not to Sue Servant or Agent as Affecting Liability of Master or Principal*, 44 Tenn.L. Rev. 188, 196–197 (1976).

Finally, the Code of Virginia contains no provision similar to the indemnity section interpreted by the Tennessee court, and there is no evidence that the Virginia General Assembly intended to exclude the vicarious liability of masters or principals from the scope of Virginia's covenant act.

Another reason offered in support of Coca-Cola's position is that master and servant are not joint tortfeasors; that is to say, they do not act in concert and, therefore, do not fall within the coverage of the covenant act. Although Virginia's covenant act does include the term "joint tortfeasors" in the section headline, this court sees no significance in this. Section headlines are intended as mere catchwords to indicate the contents of the section and are not part of the section. Va.Code § 1–13.9 (1979 Repl.Vol.). In addition, the section's substantive language makes no reference to joint tortfeasors. Indeed, the act's plain language appears to apply to a party who is vicariously liable, as the act's coverage extends to "one of two or more persons liable in tort for the same injury . . . ." *See Alaska Airlines, Inc. v. Sweat,* 568 P.2d at 929. And while a master and servant are not technically joint tortfeasors with respect to the servant's tortious act, in Virginia their liability is joint and several and governed by the same principles that are applicable to joint tortfeasors. *See Lackey v. Brooks,* 204 Va. 428, 132 S.E.2d 461 (1963); *McLaughlin v. Siegal,* 166 Va. 374, 185 S.E. 873 (1936).

■ Therefore, this court holds that a covenant not to sue given to an alleged agent pursuant to Va.Code § 8.01–35.1 does not automatically release the alleged principal from vicarious liability based on the acts of the alleged agent. Accordingly, Coca-Cola's motion to dismiss plaintiff's vicarious liability claims will be denied.

Nevertheless, § 8.01–35.1(A)(1) provides that "any amount recovered against the other tortfeasors or any one of them shall be reduced by any amount stipulated by the covenant, or in the amount of the consideration paid for it, whichever is greater . . . ."

Accordingly, this court further holds that any recovery against both Coca-Cola and Alcoa, or against either of these defendants alone, shall be reduced by $87,500, the amount of the consideration paid for plaintiff's covenant not to sue Wometco and Winn-Dixie.