## Richmond

COMMONWEALTH OF VIRGINIA V. STRATFORD PACKING COMPANY, INC.

June 16, 1958.

Record No. 4774.

Present, All the Justices.

The opinion states the case.

*Frederick T. Gray, Special Assistant Attorney General (A. S. Harrison, Jr., Attorney General; Kenneth C. Patty, Assistant Attorney General; Robert G. Cabell, Jr., Special Assistant Attorney General; Williams, Mullen, Pollard & Rogers,* on brief), for the Commonwealth.

No brief filed nor argument for the defendant in error.

SNEAD, J., delivered the opinion of the court.

Pursuant to Section 3-329, Code 1950, duly authorized agents of the Department of Agriculture and Immigration, Commonwealth of

Virginia, seized 341 cases of No. 2 canned tomatoes on August 15, 1956 and 400 cases on August 22, 1956, as being adulterated and misbranded as contemplated by Code Sections 3-315 and 3-316. Both lots were packed by and in possession of Stratford Packing Company, Inc., appellee. After an *ore tenus* hearing on two show cause orders entered against the corporation, the trial court, by its order of March 15, 1957, dismissed the citations and abated and discharged the two seizures of tomatoes. From this order the Commonwealth appealed.

Appellee did not file with this court a brief and no oral argument was heard on its behalf. We have before us the record and the Commonwealth's brief for our consideration. The testimony of the witnesses was not transcribed and it is in narrative from.

On August 15, 1956, R. L. Farmer and A. L. Turner, inspectors for the Division of Dairy and Food of the Department of Agriculture and Immigration, inspected appellee's plant while it was in operation. A written report of their findings, a copy of which was delivered to the president of the corporation, was admitted as an exhibit and shows the following objectionable conditions existing:

"1. Food in the process of manufacture is not being securely protected from flies as required in Section 3-288 of the Code of Virginia. (There were approximately three flies per bucket of peeled tomatoes, Approximately four per peeler, and flies were observed on inspection table and juice vat).

"2. Approximately 10 to 15% of rotten tomatoes going into peelers.

"3. Table under filler had grease from machinery on it and the juice was being used to adjust fill of container.

"4. Tomatoes used to adjust fill of container were being dumped into wooden vat and also tomatoes were being piled up to approximately a height of nine inches on inspection table, making the removal of all skins and rotten particles impossible.

"5. Improper facilites (*sic*) provided for washing buckets and pans daily.

"6. All troughs under peeling table dirty with rotten tomatoes.

"7. Cannery is improperly lighted and there were not lights on at time of inspection.

"8. Juice was being made from untrimmed tomatoes at time of inspection.

"9. Employees washing cans in container of water used for hand-washing. These cans were filled and processed.

"10. Too much green material going into cans."

This report concluded with the following admonition: "You are hereby notified and warned to place your cannery and equipment in a sanitary condition by August 22, 1956."

In amplifying on the report, Farmer testified that steam was coming from the juice vat and the juice "was rolling and agitated"; that after the whole tomatoes were placed in the cans, they were then filled to the desired level with juice from the vat, and that in this process some of the juice would spill and run over machinery grease on a table under the filler, was caught and returned to the juice vat. He stated that the 341 cases were seized because they were, in his opinion, manufactured under insanitary conditions whereby they may have become contaminated with filth and were suspected of having excessive skins and off color.

Turner substantially corroborated Farmer's testimony. He also stated that the 341 cases seized were packed on that day.

Farmer, accompanied by Herbert McLeod, Jr., Food Inspection Supervisor of the Department, who holds a B. S. degree in chemical engineering and a B. S. degree in pharmacy, made another inspection of the plant on August 22, 1956. Their report filed reads:

"1. Table where pans are set on to catch tomatoes from the scalder had an accumulation of rotten tomatoes, weeds and mold as well as the metal device used to fill tomato pans with.

"2. Jucie (*sic*) vat, under bottom had an accumulation of mold under it and belt trough under peeling table had an accumulation of rotten taomatoes (*sic*) in it as well as mold and was providing a medium where gnats were breeding.

"3. Food in the process of manufacture is not being securely protected from flies.

"4. Table under filler had grease from machinery on it and the juice was being used to adjust fill of container.

"5. Inadequate facilites (*sic*) provided for washing pans.

"6. Cannery is improperly lighted and there were not lights on in the cannery at time of inspection.

"7. Juice was being made from untrimmed and unsorted tomatoes.

"8. Too much green material going into the canned tomatoes.

"9. Lids on mens toilet was standing open at time of inspection.

"10. Spray rinse at end of washer was not turned on until *atten-* was directed towards it by the inspectors."

Farmer said that on this inspeciton he observed a steam pipe con-

nected with the juice vat; that the juice was being agitated and vapor was rising from it. He stated that tomatoes should be packed warm, but the introduction of live steam into the cool juice would unquestionably result in condensation and the addition of water to the juice, and that this method of warming tomatoes is no longer acceptable to State and Federal authorities. He said the 400 cases were seized because the tomatoes were suspected of being substandard, water being added, and packed under insanitary conditions.

The inspectors took as samples 6 cans of tomatoes which had been packed before their arrival, 7 cans packed after their arrival and also 2 cans of juice from the vat. The inspectors packed and processed 6 cans using as a filler juice which they squeezed from tomatoes. These samples were delivered to Paul E. Irwin, a food chemist in the employ of the Commonwealth, for analysis.

Irwin testified that 5 of the 6 cans packed before the arrival of the inspectors failed to meet the Commonwealth's regulations for drained weight. His analysis of the samples of juice which were taken from the vat showed adulteration with water of approximately 40 per cent, and that the 6 cans packed before arrival of the inspectors showed approximately 10 per cent water added to the contents. He further stated that mold and maggots found would not justify condemnation and that he did not believe it would be harmful to eat the tomatoes.

The record shows that other inspections of the plant were made on August 23, 1955, December 13, 1955 and August 9, 1956, which dates were prior to the seizures in question. Written reports of objectionable conditions found on these occasions were left with the management of the corporation. It will serve no good purpose to list them here, but suffice it to say conditions were far from being satisfactory. After the inspection on August 9, 1956, appellee was instructed not to resume operations until the conditions complained of had been corrected.

George English, a witness for appellee, testified that he had sold cans to packers for a number of years; that in his opinion screens were detrimental to canneries because insects get inside when doors are opened and not being able to leave come in contact with steam, drop and fall on the tomatoes, and that while appellee's plant needed some changes, it was clean and superior to many canneries in the State. He said that appellee's juice vat emptied itself every three minutes, and that the quantity of water added to the tomatoes was

very trivial. He further stated that he was cognizant of the fact that both State and Federal authorities objected to live steam being injected into juice vats, but when canning at a rapid rate he thought it made little difference. The record is silent as to whether or not he was present at the plant when the inspections were made.

Appellee's president testified he was its owner at the time of the seizures, but has since sold his interests. He stated that because of other interests he was not able to be at the plant as frequently as he had previously and that he had attempted to comply with the inspectors' demands by making certain improvements suggested, such as installation of a large light over the inspector's table and recovering the table in order to eliminate cracks and rust. He said the hand washing facilities were not "fancy", but were adequate for the purpose; that there was a steam line and live steam available for cleaning pans and utensils daily, and the plant was cleaned at the end of each day's operations. He did not consider the existence of flies complained of particularly bad. He further stated that the grease on the table under the filler over which juice ran and was recovered for use was merely a "little spot of clean cup grease" which was harmless, and that he did not believe tomatoes were piled 9 inches high on the inspection table. However, he admitted that could be true at one end of the table, but at the other end where the inspection was made he said they would be visible.

He also testified he was not advised that the use of steam in the juice was objectionable until August 22, 1956, the date of the second seizure; that appellee had encountered no difficulty with the Federal authorities concerning his products, and that he had caused an analysis to be made of the tomatoes and it had been reported to him that they passed the requirements. The record does not show who made this analysis.

On cross examination he admitted that the injection of steam into the juice would add some water, but due to the rate of canning the quantity of water would be very small. He explained that the toilets had been repaired a number of times, but on account of the carelessness of employees lids were broken off. However, due to their distance from the plant, he did not see how this condition would adversely affect canning.

The Commonwealth contends the evidence upon which it relies to sustain a finding that the tomatoes seized were adulterated, within the meaning of Section 3-315, Code 1950, is uncontradicted. The

applicable portions of that section which are primarily involved read as follows:

"§ 3-315 * * * A food shall be deemed adulterated:

"(a) (4) if it has been produced, prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered diseased, unwholesome or injurious to health; * * *

"(b) (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength or make it appear better or of greater value than it is."

There are also other sections of the Code of 1950 which are pertinent. Under Section 3-286, appellee was required to have the premises properly lighted while being used in its cannery operations. Section 3-287 required it to keep the machinery and implements used in the manufacturing process in a clean, healthful and sanitary condition at all times, and by the terms of Section 3-288 there was a duty on appellee to securely protect the food in process of manufacture from flies, dust and dirt, as well as from all other foreign and injurious contamination.

In 22 Am. Jur., Food, § 3, pp. 805, 806, it is stated:

"The power to regulate the manufacture and sale of food rests upon, and is limited by, the police power of the state. Food acts and regulations are intended primarily to protect the public from fraud and to secure the general health.

"The suppression of unfair competition in the production and sale of articles of food has been held to justify regulations relating to food.

"The importance to the state of protection of its food supply is also a basis for regulation of the production of food.

"In this connection it has been stated that the police power of the state is coextensive with self-protection and that it is not inaptly termed 'the law of overruling necessity.' It is that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society." See also C. J. S., Food, § 3, pp. 1044, 1045.

On the basis of the uncontradicted evidence relied upon by the Commonwealth we can reach only one conclusion. The 341 cases of tomatoes seized on August 15, 1956, are adulterated as defined in Section 3-315 (a) (4), *supra*, in that they were prepared and packed

under insanitary conditions whereby they may have become contaminated with filth. Likewise, the evidence conclusively shows that the 400 cases seized on August 22, 1956 are adulterated. They were prepared and packed under insanitary conditions whereby they may have become contaminated with filth. Furthermore, this lot is adulterated within the meaning of Section 3-315 (b) (4), *supra*, because approximately 10 per cent water was added to the cans by injection of live steam into the vat containing juice used as a filler, thereby reducing the quality of the tomatoes.

The trial court erred in dismissing the two show cause orders and in abating and discharging the seizures. The order appealed from is reversed, and the seized tomatoes are forfeited to the Commonwealth with direction to the Commissioner of Agriculture and Immigration to dispose of them as provided by Section 3-333, Code 1950.

*Reversed and final judgment.*