COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judge Benton and Retired Judge Bumgardner*
Argued at Richmond, Virginia


MARY S. VANDERWOUDE HILL
  AND JAMES J. HILL
                                                          OPINION BY
v.        Record No. 1133-04-4                   JUDGE JAMES W. BENTON, JR.
                                                          JANUARY 17, 2006
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                            James H. Chamblin, Judge

        Norman Lamson for appellants.

        John H. McLees, Senior Assistant Attorney General (Judith Williams
        Jagdmann, Attorney General, on brief), for appellee.


        A jury convicted Mary S. Vanderwoude Hill and her husband, James J. Hill, of a

misdemeanor for refusing to submit to a warrantless inspection of their goat cheese

manufacturing facilities in violation of Code § 3.1-388(e).  The Hills contend that the Fourth

Amendment bars warrantless searches of premises operated by "homeowners and occupants of a

farm not required by law to obtain a license to sell . . . goat cheese made thereon."  We hold that

the warrantless search falls within the exception for closely regulated industries and that the

building where the Hills make their cheese within the curtilage of their home is subject to the

administrative inspection.  We, therefore, affirm the convictions.

_____

        * Judge Bumgardner participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2005.

I.

Since 1994, Mary and James Hill have owned and operated a 200-acre farm in Fauquier County, upon which they raise goats and other livestock. From early spring through late October, Mary Hill makes approximately nine pounds of goat cheese each week from the milk they collect from their goats. She stores the cheese at the farm and sells it at a farmer's market.

Gerald W. Williams, a food safety specialist employed by the Virginia Department of Agriculture and Consumer Services, attempted to conduct a sanitary inspection of the Hills' goat cheese facilities on August 2, 2000. Pursuant to the Department's standard procedure, Williams arrived at the farm unannounced, displayed his credentials, and explained the purpose of his visit. Williams also provided the Hills with his business card and information about Virginia's food laws. Though Williams attempted to explain the law that permitted his inspection, the Hills refused his inspection.

A month later, Williams visited the farm after having made an appointment with the Hills and their attorney. When he arrived at the farm, he displayed his badge to the Hills and their attorney. Without hindrance, Williams inspected what he described to be "a small operation," approximately ninety feet from the Hills' residence, in which the Hills milk their goats and make goat cheese. He observed two objectionable conditions: an inadequate pasteurizer and the absence of sanitation test strips. Before leaving, Williams took samples of the cheese and gave the Hills an inspection sheet that noted the objectionable conditions and identified the samples he took. Williams and both Hills signed the inspection sheet.

Williams next arrived for an inspection in October 2001. He again presented his badge to the Hills and announced he was there for a routine inspection. During the inspection, Williams observed four objectionable conditions: an inadequate pasteurizer, no daily records of the aging of the hard cheeses, no records for the soft cheeses, and incorrect labels on the finished product.

At the conclusion of his inspection, he again gave the Hills his inspection report. Between September 2000 and April 2003, Williams visited the farm four or five times, generally at 9:00 a.m.

In April 2003, Joseph William Buchanan, another food safety specialist, visited a farmer's market and found Mrs. Hill selling her goat cheese from a stall. He read the informational articles she had posted about the farm, talked with her about the cheese, purchased a block of goat cheese, and took a business card. Buchanan later froze the cheese, shipped it to his office in Richmond to be tested, and submitted with the cheese a report of his visit to the farmer's market.

A month later, when Williams went to the farm to conduct an unannounced inspection, the Hills informed him that he was trespassing on private property and ordered him to leave. After Williams explained that the Virginia food laws authorized his entry and inspection during normal hours of operation, the Hills agreed to allow Williams to conduct an inspection on June 4, 2003. Before the day of this scheduled appointment, the Hills telephoned Williams and told him that he would need a warrant to enter their farm.

Williams returned to the farm unannounced on July 9, 2003. The Hills informed him that school children were coming to tour the farm, said they were "refusing his inspection," and told him to leave. Following this event, Williams appeared before a magistrate, who issued summonses against Mary and James Hill for "refusing to permit the entry of the Commissioner's duly authorized agents to [their] goat cheese manufacturing, processing and/or storage facility for the purpose of making an inspection . . . in violation of [Code §] 3.1-388(e)."

A judge of the general district court convicted the Hills, sentenced them to thirty days in jail with all thirty days suspended, put them on probation for twelve months, and fined each of them $250. The Hills appealed to the circuit court. Before trial, the circuit court judge denied

their motion to dismiss the proceeding, ruling that the Fourth Amendment did not bar the

warrantless inspections of their goat cheese manufacturing facilities.  Following the presentation

of evidence, the jury convicted the Hills of the misdemeanor and fined them $100 each.  The

Hills appeal these convictions.[1]

## II.

The specific issue raised by the Hills is "[w]hether the Fourth Amendment allows

homeowners and occupants of a farm, not required by law to obtain a license to sell their [goat]

cheese made thereon, to be convicted under [Code §] 3.1-388(e) for refusing to submit to a

warrantless inspection by a food inspector."  The Hills argue that the administrative inspections

violate the Fourth Amendment because they do not fall within "narrow circumstances under

which a warrant is not required" and further argue that, because they make the goat cheese

within the curtilage of their home, they have a greater expectation of privacy than does a

commercial operation.  The Commonwealth responds that the statutes reasonably provide for

warrantless inspections of the goat cheese facilities because it is "a closely regulated industry"

and further that the Hills cannot shield their goat cheese facilities from administrative inspections

by putting the facilities in or near their home.

<u>Administrative Inspections:  Overview</u>

The Fourth Amendment does not prohibit all government intrusions onto private

property, but rather protects against unreasonable intrusions.  <u>Donovan v. Dewey</u>, 452 U.S. 594,

---

[1] After filing this appeal, the Hills also filed a civil action in the District Court for the Eastern District of Virginia against the Commissioner of Agriculture and Consumer Services, seeking injunctive and declaratory relief under 42 U.S.C. § 1983.  <u>Hill v. Courter</u>, 344 F. Supp. 2d 484 (E.D. Va. 2004).  The Hills argued that Code § 3.1-399 is unconstitutional as applied to them because the law authorizes warrantless searches of their home and farm buildings in violation of their Fourth Amendment right to be free from unreasonable searches.  <u>Id.</u> at 488-89. The district court judge ruled that comity required the federal court to abstain from hearing the Hills' case because the constitutionality of the statute is the subject of this appeal.  <u>Id.</u> at 491.

599 (1981). This principle means that "[t]he Fourth Amendment generally requires [government agents] to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999). This general principle, however, has some well-defined exceptions. The Supreme Court has held that "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." Donovan, 452 U.S. at 598. "[I]n certain circumstances government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.'" Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (citation omitted).

This exception does not apply to all regulated businesses or industries.

> The Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable. . . . This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes. An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home. This expectation is particularly attenuated in commercial property employed in "closely regulated" industries. . . . "Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise."

New York v. Burger, 482 U.S. 691, 699-700 (1987) (citations omitted). The Supreme Court explained the contours of this exception for closely regulated businesses as follows:

> Although the number of regulations certainly is a factor in the determination whether a particular business is "closely regulated," the sheer quantity of pages of statutory material is not dispositive of this question. Rather, the proper focus is on whether the "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware

- 5 -

that his property will be subject to periodic inspections undertaken for specific purposes."

Id. at 705 n.16 (quoting Donovan, 452 U.S. at 600). The Court also noted that the duration of the regulatory scheme is a factor in this analysis, but it "declined to limit [its] consideration to the length of time during which the business . . . had been subject to federal regulation." Id. at 701. Rather, the Court "essentially defined [the exception] by 'the pervasiveness and regularity of the . . . regulation' and the effect of such regulation upon the owner's expectation of privacy." Id. (quoting Donovan, 452 U.S. at 605-06).[2] The Court gave an indication in an earlier decision that each regulatory scheme must be analyzed on a case by case basis because it held that "[t]he reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute." Marshall v. Barlow's, Inc., 436 U.S. 307, 321 (1978).

## The Virginia Food Act

Chapter 20, Article 3 of Title 3.1 of the Code of Virginia is known as the "Virginia Food Act." Code § 3.1-386. This Act and other statutes in Chapter 20 ("Food and Drink Generally") provide a scheme for monitoring the preparation, manufacture, and storage of food and drink in

---

[2] Though the courts have held that certain businesses and industries are closely or pervasively regulated, not all businesses and industries are. Industries found to be closely or pervasively regulated are varied. See Burger, 482 U.S. 691 (auto salvage industry); Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264 (1981) (coal mining industry); United States v. Biswell, 406 U.S. 311 (1972) (gun industry); Colonnade Catering Corp. v. United States, 397 U.S. 72 (1970) (liquor industry); Shoemaker v. Handel, 795 F.2d 1136 (3rd Cir. 1986) (horse racing industry); United States v. Acklen, 690 F.2d 70 (6th Cir. 1982) (pharmacies); Marshall v. Nolichuckey Sand Co., Inc., 606 F.2d 693 (6th Cir. 1979) (sand and gravel industry); Pollard v. Cockrell, 578 F.2d 1002 (5th Cir. 1978) (massage parlors); United States v. Thriftmart, Inc., 429 F.2d 1006 (9th Cir. 1970) (food warehouses regulated by the Federal Food, Drug & Cosmetic Act); United States v. Approx. 600 Sacks of Green Coffee Beans, 381 F. Supp. 2d 57 (D. Puerto Rico 2005) (coffee industry). But see Marshall v. Barlow's Inc., 436 U.S. 307, 313-15 (1978) (holding that the government could not use the administrative exception to conduct warrantless searches to inspect for OSHA violations because any business could potentially violate OSHA regulations and as such the legislation was not sufficiently tailored to put businesses on notice that they were subject to warrantless searches).

- 6 -

Virginia. The food and dairy industry has long been regulated in the Commonwealth. In 1908, the general assembly established the position of the dairy and food commissioner and his office. 1908 Va. Acts, ch. 188. That legislation authorized the commissioner or any of the commissioner's agents to enter "any creamery, factory, store, salesroom, drug store, or laboratory, or place where [the inspector] has reason to believe food or drink is made, stored, sold, or offered for sale" and to inspect the premises and goods. 1908 Va. Acts, ch. 188, § 6. The object of this authority was "improving the quality and creating and maintaining uniformity of the dairy products of the state." 1908 Va. Acts, ch. 188, § 11. Any person who "wil[l]fully hinder[ed] or obstruct[ed]" the commissioner was guilty of a misdemeanor. 1908 Va. Acts, ch. 188, § 9.

Since that time, the legislature has recodified and amended the Food Act. The current regulatory scheme in Chapter 20 vests all powers previously held by the dairy and food commissioner with the Commissioner of Agriculture and Consumer Services. Code § 3.1-361. Though the official name has changed over the years and the acts have been recodified to provide clarity, the substance of the regulations has remained the same. Compare Code §§ 3.1-361 to 3.1-419 with Code §§ 3-307 to 3-322, Code §§ 1154(1) to 1190 (1942), and Code §§ 1154(1) to 1190 (1930). The Food Act defines key terms, Code § 3.1-387, and references prohibited acts, see, e.g., Code § 3.1-388, such that any person operating an establishment where food is manufactured, packaged, or stored should be on notice as to what is regulated. Further, the Food Act confers authority on the Virginia Board of Agriculture and Consumer Services to promulgate regulations necessary to enforce the Act. Code § 3.1-398.

The Food Act specifically prohibits anyone from "operat[ing] a food manufacturing plant, food storage warehouse, or retail food store until it has been inspected by the Commissioner." Code § 3.1-398.1. Thus, while these statutes do not require a person to obtain

license from the Commissioner, they do establish a means by which all persons operating a food manufacturing plant or storage warehouse must comport with the Act before beginning their operations. The Food Act further specifies the Commissioner's ongoing duty to inspect these facilities. Code § 3.1-399.

The Commissioner is required to monitor for and to seize foods "which are unsound, or contain any filth, decomposed or putrid substance, or that may be poisonous or deleterious to health or otherwise unsafe." Code § 3.1-391. The Food Act also authorizes the Commissioner to inspect for adulterated or misbranded food and for food to which poisonous or deleterious substances have been added. Code §§ 3.1-395 to 3.1-397. In conducting the inspections, the Commissioner's agents may only enter "any factory, warehouse, or establishment in which foods are manufactured, processed, packed or held for introduction into commerce." Code § 3.1-399. Inspectors may enter such premises during "reasonable hours" to look for violations of any provisions of this Act and to collect samples for testing. Id. If any person denies entry to an inspector to any establishment in which food is manufactured, processed, packed, or held for introduction into commerce, that individual has committed a misdemeanor. Code §§ 3.1-388(e), 3.1-390.

Simply put, the Food Act is long standing, comprehensive, and designed to protect a significant aspect of the public health and safety: the safe production and storage of foods offered to the public for consumption. Individuals who manufacture food for public consumption have long been the targets of particular scrutiny under the Food Act, which specifies what actions are prohibited, allows injunctions to prevent violations, and prescribes penalties for those who violate the Act. Code §§ 3.1-388, 3.1-389, and 3.1-390. Viewed in this vein, the Hills have been put on notice of the regulatory scheme and cannot be said to have a reasonable expectation of freedom from warrantless administrative searches. The statutes define

- 8 -

a pervasive and regular administrative scheme that focuses on ensuring safe production of foods. See State v. McGillicuddy, 646 A.2d 354, 355 (Me. 1994) (holding that warrantless inspections are logically required in potato packing houses because the food product is wrapped there prior to being sold and because the statute's purpose is to ensure quality of the product going to consumers).

Application of the Burger Factors to the Food Act

In Burger, the Supreme Court identified three factors that must be satisfied before a warrantless search of a closely regulated business "will be deemed reasonable." 482 U.S. at 702. First, the government must have a substantial interest that "informs the regulatory scheme pursuant to which the inspection is made." Id. Second, the warrantless inspection must be "'necessary to further [the] regulatory scheme.'" Id. at 702-03 (citation omitted). Third, the application of the inspection program must provide "'a constitutionally adequate substitute for a warrant.'" Id. at 703 (citations omitted). In other words, to satisfy this third factor, the regulatory scheme must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. Id.; see also McCauley v. Commonwealth, 17 Va. App. 150, 152, 435 S.E.2d 891, 892 (1993) (applying the Burger factors to motor carrier safety inspections).

The regulatory scheme that governs the Food Act satisfies each criterion necessary to authorize a warrantless inspection of the Hills' facilities pursuant to Code § 3.1-399. First, the Commonwealth has a significant interest in ensuring that the goat cheese, which is a food product the Hills make for commercial sale, is safe for consumption. This interest is certainly no less than New York's interest in regulating automobile junkyards, where, in Burger, the Court concluded that the state had a significant interest in eliminating automobile theft. 482 U.S. at 708. The Court found that theft posed a substantial social and economic problem for the citizens

of New York, as well as of other states. Id. The Court also found that controlling the stolen automobile market could diminish theft. Id. at 709.

The Commonwealth likewise has a substantial interest in protecting the health of its citizens by regulating its food supply. See Commonwealth v. Stratford Packing Co. Inc., 200 Va. 11, 16, 104 S.E.2d 32, 36 (1958) (holding that food acts and regulations are intended primarily to secure the general health of the public and are inherent aspects of the state's police power). "There is no doubt about the public policy of this State with respect to the manufacture and sale of food. [The Virginia Food Act] expressly make[s] it unlawful to sell or expose for sale any unhealthy, unwholesome, or adulterated food for human use." Swift & Co. v. Wells, 201 Va. 213, 221, 110 S.E.2d 203, 208 (1959). The statutes are aimed at the food industry and are intended to control the spread of illness caused by perishable foods such as cheese and other dairy products. "The importance to the state of the protection of its food supply is . . . a basis for regulation of the production of food." Stratford Packing, 200 Va. at 16, 104 S.E.2d at 36. "Indeed, the Supreme Court of Virginia has long recognized that it is 'inherent in the plenary power [of] the state[,] which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society,' to regulate the food and drink industry." McClellan v. Commonwealth, 39 Va. App. 759, 767, 576 S.E.2d 785, 789 (2003) (quoting Stratford Packing Co., 200 Va. at 16, 104 S.E.2d at 36).

Second, the fundamental purpose of this regulatory scheme can only be furthered by unannounced inspections. In upholding warrantless administrative inspections in another context, the Supreme Court noted that, "if inspection is to serve as a credible deterrent, unannounced, even frequent, inspections are essential. . . . [T]he prerequisite of a warrant could easily frustrate inspection and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible." United States v. Biswell,

406 U.S. 311, 316 (1972). This same rationale can be extrapolated to the Food Act. The health and safety concerns that apply to the food industry are significant. Given the size and variety of food manufacturing facilities in Virginia, the potential for contaminated food to enter the market is tremendous. Evidence of misbranding and adulteration could easily be concealed if advance notice of an inspection was given. In this case, two years before the Hills barred the inspector, he found the absence of sanitation strips and an inadequate pasteurizer, both of which could be masked by a temporary fix if notice was required. The element of surprise inherent in warrantless inspections is necessary to ensure that the proper standards are met and that the food supply remains safe.

Third, the regulations provide the owner of these establishments with a constitutionally adequate substitute for a warrant. Burger, 482 U.S. at 711. Here the owners were informed that Virginia law authorized the inspections. Inspector Williams presented his credentials and provided the Hills with a copy of the food law authorizing his inspection and detailing the Hills' responsibilities. Moreover, the earlier inspections were limited as to time, place, and scope and were consistent with Code § 3.1-399, which provides that the inspectors may only enter during reasonable hours and may only inspect places where the food or drink is manufactured, processed, packaged, stored, or sold. Evidence showed that the inspections occurred between 9:00 a.m. and 5:00 p.m. and involved only those areas where the Hills manufactured, processed, packaged, stored, and sold their goat cheese. Thus, the record establishes processes that provide a constitutionally acceptable substitute for a warrant.

We hold that each of the Burger factors was met. Therefore, the warrantless search of this goat cheese manufacturing facility was reasonable. See Contreras v. City of Chicago, 119 F.3d 1286, 1290 (7th Cir. 1997) (applying the Burger factors to an administrative inspections scheme involving pizza restaurants); North Carolina v. Nobles, 422 S.E.2d 78, 82 (N.C. Ct. App.

1992) (applying the Burger factors to the administrative inspection of a fish seller and noting that the "high perishability and portability" of food limits the window in which inspections will be effective).

Location of the Facilities within the Curtilage

The Hills contend that because their goat cheese operation occurs within the curtilage of their home they have a greater expectation of privacy than does a purely commercial operation. Citing Camara v. Municipal Court, 387 U.S. 523 (1967), the Hills argue that "it is of constitutional significance that the object of the inspection is a home in which a business is being operated, as opposed to a business not occupied as a residence."

Camara involved a refusal to permit a housing inspector to enter an apartment in a private building "to make a routine annual inspection for possible violations of the city's housing Code." 387 U.S. at 526. In holding that the Fourth Amendment barred the warrantless inspection of the residence, the Supreme Court observed that, "in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day." Id. at 539. Furthermore, the Court recognized that exceptions to the warrant requirement, while not applicable in Camara, did exist for some administrative searches.

> Since our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See North American Cold Storage Co. v. City of Chicago, 211 U.S. 306 (seizure of unwholesome food); Jacobson v. Massachusetts, 197 U.S. 11 (compulsory smallpox vaccination); Compagnie Francaise v. Board of Health, 186 U.S. 380 (health quarantine); Kroplin v. Truax, 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle).

Camara, 387 U.S. at 539. In other words, there are "certain carefully defined classes of cases" that Camara did not foreclose from warrantless administrative searches. 387 U.S. at 528.

Although it is true that the <u>Camara</u> Court barred the inspector from entering a residence without a warrant, the circumstances there did not pose immediate health and safety concerns flowing from the production of food for public consumption. As the Supreme Court later explained in <u>Burger</u>, it "first examined the 'unique' problem of inspections of 'closely regulated' businesses in . . . <u>Colonnade Corp. v. United States</u>, 397 U.S. 72 (1970) . . . [and] in <u>United States v. Biswell</u>, 460 U.S. 311 (1972)." <u>Burger</u>, 482 U.S. at 700. Though this particular exception was not at issue in <u>Camara</u>, the Court there did allude to exceptions for the "seizure of unwholesome food," 387 U.S. at 539, and a narrow set of cases allowing "a search of private property without a proper consent." <u>Id.</u> at 538. Indeed, in cases decided after <u>Camara</u>, the Supreme Court held that "administrative inspections in 'closely regulated' businesses" are an "established exception to the warrant requirement." <u>Burger</u>, 482 U.S. at 703. <u>See also</u> <u>Donovan</u>, 452 U.S. at 599-600. Applying a standard of reasonableness, the same standard used in <u>Camara</u>, <u>see</u> 387 U.S. at 539, the Supreme Court held in <u>Burger</u> that a "special need" exists for warrantless administrative searches "in the context of [a closely] regulated business." 482 U.S. at 702. Simply put, <u>Camara</u> is not controlling here because it was not a case about a closely regulated business.

We recognize that "[t]he curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." <u>Dow Chem. Co. v. United States</u>, 476 U.S. 227, 235 (1986). This principle, however, must be applied with recognition of other Fourth Amendment principles.[3] "An expectation of privacy in commercial premises, . . . is different

---

[3] In <u>Griffin</u>, 483 U.S. 868, the Supreme Court permitted the search of a probationer's home without a warrant, recognizing that it has "permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" <u>Id.</u> at 873 (citation omitted). Significantly, the Court noted in <u>Griffin</u> that it has "held, for similar reasons, that in certain circumstances government investigators conducting

- 13 -

from, and indeed less than, a similar expectation in an individual's home." Burger, 482 U.S. at 700. In other words, "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." Minnesota v. Carter, 525 U.S. 83, 90 (1998). "[A] business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context." G.M. Leasing Corp. v. United States, 429 U.S. 338, 353 (1977).

By producing goat cheese within the curtilage of their home for later sale to the public, the Hills made the choice to expose that area to the administrative inspection provisions of the food laws. They lessened their expectations of privacy by converting otherwise private space to an area used in their commercial enterprise, which is subject to administrative inspections. See Rush v. Obedo, 756 F.2d 713, 723 (9th Cir. 1985) ("hold[ing] that properly limited warrantless inspections of family day care homes do not offend the Fourth Amendment").

> The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.

Donovan, 452 U.S. at 598-99. "'The businessman in a regulated industry in effect consents to the restrictions placed upon him.'" Marshall, 436 U.S. at 313 (citation omitted). Thus, a person who operates a commercial enterprise that is subject to close regulation does not have an interest in being free from inspection. Donovan, 452 U.S. at 599.

---

searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.'" Id. (citing Burger, 482 U.S. at 702-03; Donovan, 452 U.S. at 602; Biswell, 406 U.S. at 316; Camara, 387 U.S. at 538).

- 14 -

In McClellan, this Court discussed the operation of a "food manufacturing plant" at a home. 39 Va. App. at 764-67, 576 S.E.2d at 787-89. There, the defendant refused to permit inspectors onto her farm to inspect her goat cheese facilities and argued that her home "was [not] a 'food manufacturing plant, food storage warehouse, or retail food store' as contemplated in Code § 3.1-398.1." McClellan, 39 Va. App. at 764, 576 S.E.2d at 787. We rejected those claims.

> [T]he "ordinary" use of the term "plant" encompasses any building or dwelling where such "manufacturing, packaging, labeling, or holding of human food" takes place. Accordingly, McClellan's "operation" met the definition of a "food manufacturing plant" within the clear context of the statute. . . .
>
> McClellan offered the cheese that she manufactured for sale in the Commonwealth. It is clear that the General Assembly intended the Virginia food and drink laws, enforced by the Commissioner and the Board of Agriculture, to apply to operations like McClellan's, *regardless of where she manufactured the cheese* and offered it for sale.

Id. at 767-68, 576 S.E.2d at 789 (emphasis added). See also Parker v. Commonwealth, 42 Va. App. 358, 387, 592 S.E.2d 358, 372-73 (2004) (noting "that this Court has previously held [in McClellan] that a home kitchen, similar to Parker's, may constitute a 'food manufacturing plant' within the context of Code § 3.1-398.1").

"[T]he General Assembly has charged the Commissioner and the Board of Agriculture with the duty to 'inquire carefully into the dairy and food and drink products . . . which are manufactured or sold, or exposed, or offered for sale in this Commonwealth.'" McClellan, 39 Va. App. at 767, 576 S.E.2d at 789 (quoting Code § 3.1-402). Because of the state's significant interest in protecting the public health by inspecting facilities that manufacture and store food, we must "defer to [the] legislative determination" that warrantless inspections "are essential" to promote "the 'specific enforcement needs'" of this Act. Donovan, 452 U.S. at 603 (citations omitted). We, therefore, hold that the location of the Hills' goat cheese manufacturing facility

- 15 -

within the curtilage of their home did not create a Fourth Amendment protection against the administrative warrantless search.  The search was conducted in accordance with the statute to enforce the food laws, a matter subject to close regulation.  Accordingly, we affirm the convictions.

<u>Affirmed.</u>